

**FILED**

Feb 20 2018, 5:37 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Bryan H. Babb
Bradley M. Dick
Bose McKinney & Evans LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Steven C. Shockley
Russell C. Menyhart
Taft Stettinius & Hollister LLP
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| City of Hammond, <br> *Appellant-Plaintiff,* <br><br> v. <br><br> Herman & Kittle Properties, Inc., <br> *Appellee-Defendant.* | February 20, 2018 <br><br> Court of Appeals Case No. <br> 49A04-1612-PL-2784 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Michael D. Keele, Judge <br><br> Trial Court Cause No. <br> 49D07-1601-PL-531 |

**Robb, Judge.**

# Case Summary and Issues

[1] In 1961, the City of Hammond created an inspection program for rental housing that permitted inspections of housing and required inspections of rooming houses. In 2001, Hammond created a program which required annual registration of all rental housing and assessed a per unit fee. Beginning in 2011, the Indiana General Assembly passed a series of bills related to rental registration and inspection programs, including a 2014 bill that restricted fees that could be imposed by a rental registration program ("Fee Restriction") unless the program was created prior to July 1, 1984 ("Fee Exemption"). In 2014, Hammond sought payment of nearly $86,000 from Herman & Kittle Properties, Inc. ("HKP") for overdue registration fees for two of its rental properties. Based on the 2014 legislation, HKP disputed it owed the entirety of those fees. Hammond then filed a complaint seeking a declaratory judgment that because its inspection program was created prior to July 1, 1984, its program was unaffected by the 2014 legislation and, accordingly, HKP owed the fees in question.

[2] While that declaratory judgment action was pending, the General Assembly in 2015 enacted further legislation that amended the definition of a "rental registration or inspection program" such that there was no question Hammond's registration program did not qualify for the Fee Exemption. Hammond then amended its complaint to add Counts II and III seeking a declaratory judgment that the 2015 legislation was special legislation in violation of Article 4 Sections 22 and 23 of the Indiana Constitution. The State

of Indiana intervened in the action for the limited purpose of defending the constitutionality of the law.

[3]     Both Hammond and HKP filed motions for summary judgment. The trial court granted summary judgment to Hammond on the first count, finding Hammond qualified for the Fee Exemption in 2014. The trial court also found that although the Fee Exemption is special legislation, it does not violate the Indiana Constitution. The trial court therefore granted summary judgment to HKP on Counts II and III of Hammond's complaint. Hammond now appeals, raising three issues for our review:

> 1) Whether Hammond is entitled to summary judgment declaring the Fee Exemption is in violation of Indiana Constitution Article 4, Section 22's prohibition on special legislation relating to salaries and fees;
>
> 2) Whether Hammond is entitled to summary judgment declaring the Fee Exemption is in violation of Indiana Constitution Article 4, Section 23's requirement that where possible, laws must be general; and
>
> 3) Whether, if the Fee Exemption is unconstitutional, it is severable from the remainder of section 36-1-20-5 or whether the entire section must be stricken.

HKP's brief, in which the State has joined, does not challenge the entry of summary judgment for Hammond on Count I. In addition to meeting Hammond's argument with respect to Counts II and III, HKP alleges

preliminarily that Hammond does not have standing to challenge the constitutionality of the Fee Exemption.

[4] Concluding that Hammond has standing, that the Fee Exemption runs afoul of both Sections 22 and 23 of Article 4 of the Indiana Constitution, and that the Fee Exemption is not severable from the remainder of section 36-1-20-5, we reverse and remand to the trial court to enter summary judgment for Hammond on Counts II and III.

# Facts and Procedural History

## I. Hammond's Ordinances

[5] In August 1961, Hammond enacted Ordinance 3337, "an ordinance establishing minimum standards governing supplied facilities, maintenance and occupancy of dwellings within the City of Hammond; fixing certain responsibilities and duties of owners and occupants of dwellings; authorizing the inspection of dwellings, the condemnation of dwellings unfit for human habitation, and fixing the penalties for violations." Appendix to Brief of Appellant, Volume II at 99. In pertinent part, Ordinance 3337 provides:

> The Health Officer and/or the Fire Inspector and/or the Building Commissioner are hereby authorized and directed to make inspections to determine the condition of dwelling units, rooming units, and premises located within the City of Hammond, in order that they may perform their duties of safeguarding the health and safety of the occupants of dwellings and of the general public. For the purpose of making such inspections, the Health Officer, and/or Fire Inspector and/or Building Commissioner

are hereby authorized to enter, examine and survey at all reasonable times, all dwellings, dwelling units, rooming units, and premises.

*Id.* at 101 (Section 2.1); *see also* Hammond City Code § 96.135(B) (2002) (authorizing and directing the Code Enforcement Commissioner to make inspections to determine the condition of dwelling units, rooming units, and premises in the city and requiring the owner or occupant of every dwelling, dwelling unit or rooming unit to give an authorized city inspector access to the premises). A "dwelling" is "any building which is wholly or partly used or intended to be used for living or sleeping by human occupants . . . ." App. to Br. of Appellant, Vol. II at 99 (Section 1.5). A "dwelling unit" is "any room or group of rooms located within a dwelling and forming a single habitable unit with facilities which are used or intended to be used for living, sleeping, cooking and eating." *Id.* at 100 (Section 1.6). A "rooming unit" is "any room or group of rooms forming a single habitable unit used or intended to be used for living and sleeping, but not for cooking or eating purposes." *Id.* at 101 (Section 1.21).

[6] In addition, Ordinance 3337 has a section devoted to hotels and rooming houses. *Id.* at 108. A "rooming house" is "any dwelling, or that part of any dwelling containing three or more rooming units, in which space is let by the owners or operator to persons who are not husband or wife, son or daughter, mother or father, or sister or brother of the owner or operator." *Id.* at 101 (Section 1.22). Every hotel and rooming house is required to be inspected twice

each year and every person maintaining or operating a hotel or rooming house is obligated to pay the City Controller an annual inspection fee of $5 per hotel or rooming house. *Id.* at 108 (Sections 9.2(A) and 9.2(B)).[1] Thus, Hammond's inspection program applies to both owner-occupied dwellings and rentals.

[7] In January 2001, Hammond enacted Ordinance 8327, the purpose of which "is to protect the health, safety and general welfare of the citizens of the City of Hammond by requiring the registration of all rental housing units which are or shall be in existence in the City of Hammond." *Id.* at 118. The ordinance required "[a]ny owner of real property in the City of Hammond, which real property is used as rental housing, . . . to register all such properties on an annual basis." *Id.* at 119. "Rental housing" is defined as "any room, dwelling unit, rooming unit or portion thereof let or intended to be let to a family or person for compensation." *Id.* The ordinance also imposed a five dollar annual registration fee for each dwelling or rooming unit. *Id.* at 119-20. In 2004, Ordinance 8327 was amended to increase the annual registration fee for each dwelling or rooming unit to $10. *Id.* at 124. In 2010, Ordinance 9060 increased the annual fee to $80 "in order for the City of Hammond to bear the increased costs of inspections and enforcement actions on income property . . . ." *Id.* at 129. A 2011 ordinance made other changes to the rental registration program that are not relevant to this litigation, but specifically continued the $80 annual

---

[1] Currently, this provision also applies to motels and the inspection fee is $100. Hammond City Code § 96.088(B) (2004).

fee. *Id.* at 137; *see also* Hammond City Code § 96.152(C) (2011). Failure to register annually subjects the owner to a fine per unit per day.

## II. Relevant Statutes and Legislative History[2]

### A. 2011 – HEA 1543

### *Regulation of Residential Leases Begins by Requiring Fees be Maintained in a Special Fund and Allowing Landlords to Pass Fee on to Tenants*

[8] House Bill 1543 was introduced in 2011 to add a chapter to Title 36 concerning the regulation of residential leases. As introduced, the bill proposed, among other things, that a regulation by a political subdivision regarding landlord/tenant relations could not require owners of rental units to be registered with the political subdivision. App. to Br. of Appellant, Vol. II at 145 (HB 1543 Introduced Version Sec. 5).[3] HB 1543 would therefore have barred all political subdivisions from registering rental units and therefore barred all registration fees. Ultimately, however, the General Assembly enacted Indiana Code chapter 36-1-20 as follows:

---

[2] Although the substance of Hammond's inspection program is relevant to the issues given the statutory definition of "rental registration and inspection program" added in 2015, inspection fees themselves are not at issue. The following recitation of statutory history is therefore limited to the changes relevant to registration fees.

[3] The proposed text read as follows:
A regulation may not do any of the following:
(1) Require owners of rental units to be:
(A) licensed; or
(B) registered with the political subdivision.

Sec. 1.  The definitions in IC 32-31-3 apply throughout this chapter.

Sec. 2.  (a) Except as provided in subsection (b), the owner of a rental unit assessed any inspection, registration, or other fee by a political subdivision pertaining to the rental unit may:
(1) notify the tenants of the rental unit of the assessment of the fee; and
(2) require the tenants of the rental unit to reimburse the owner for the payment of the fee.
* * *

Sec. 3.  Any inspection, registration, or other fee assessed under section 2 of this chapter and collected by a political subdivision must be maintained in a special fund dedicated solely to reimbursing the costs reasonably related to services actually performed by the political subdivision that justified the imposition and amount of the fee.  Each fund shall be maintained as a separate line item in the political subdivision's budget.  Money in the fund may not at any time revert to the general fund or any other fund of the political subdivision.

*Id.* at 150.  Thus, the bill as enacted allowed political subdivisions to impose a fee in any amount for registration of rental units, but required those fees to be maintained in a special fund to be used only for reimbursing program costs. The bill also allowed landlords to pass the fees on to tenants.  An emergency was declared for the bill and it became effective upon passage on May 10, 2011.

## B. 2013 – HEA 1313

### *Amendment to Temporarily Freeze Fees and Appoint an Interim Study Commission*

[9] House Bill 1313 proposed to repeal chapter 36-1-20 and add a new chapter that would allow registration of rental units but bar imposition of a rental registration fee. *See id.* at 154 (HB 1313 Introduced Version Sec. 3).[4] The bill as enacted, however, amended chapter 36-1-20 to add a new section placing a temporary moratorium on imposing new registration fees or increasing existing registration fees. Ind. Code § 36-1-20-4(b) (2013); App. to Br. of Appellant, Vol. II at 157 ("A regulation that does any of the following may not be adopted after February 28, 2013: . . . [i]mposes or increases a fee or other assessment for . . . [r]egistration of an owner, landlord, or rental unit."). By its own terms, this section expired on July 1, 2014. Ind. Code § 3-1-20-4(d) (2013); App. to Br. of Appellant, Vol. II at 158. An interim study committee was appointed to study the topic of regulation of residential leases by political subdivisions. App. to Br. of Appellant, Vol. II at 158.

[10] The minutes from the September 2013 meeting of the Interim Study Commission on Economic Development regarding this issue show

---

[4] The relevant section reads as follows:

> A regulation that does any of the following may not be adopted or enforced:
> * * *
> (3) Imposes a fee for any of the following:
> > (A) Inspection of a rental unit.
> > (B) Registration of an owner, landlord, or rental unit.
> > (C) For any other purpose.

Representative Speedy introduced the topic by indicating there is "a concern that several political subdivisions have increased the fees to the point that it impacts the affordability of housing and is detrimental to professionally managed rental properties and to new rental housing development." App. to Br. of Appellant, Vol. III at 190. Representative Speedy "proposed that the General Assembly adopt a comprehensive policy on fees that a political subdivision may charge with regard to rental properties." *Id*. Representatives of various organizations and towns, as well as owners and residents of rental housing, also gave statements about registration and inspection programs.

## C. 2014 – HEA 1403

### *Amendment Creating the Annual Registration Fee Restriction and Date-Based Fee Exemption*

[11] House Bill 1403, introduced on January 16, 2014, proposed to amend chapter 36-1-20 to provide as follows with respect to registration programs:

> Sec. 5. (a) This chapter does not prohibit a political subdivision from establishing and enforcing a registration program for rental units within the political subdivision.
>
> (b) A political subdivision may assess a *one (1) time* registration fee of not more than five dollars ($5) for a rental unit community. . . .

App. to Br. of Appellant, Vol. II at 165 (HB 1403 Introduced Version Sec. 6) (emphasis added). This original proposal would have allowed a political subdivision to register rental units but restricted it to imposing a one-time-only

fee of not more than five dollars. The Legislative Services Agency ("LSA") prepared a Fiscal Impact Statement noting there are fourteen Indiana cities and towns, including Bloomington, Hammond, and West Lafayette, that have rental registration and/or inspection programs with fees ranging from $10 per unit to $200 per rental community. *Id.* at 169. The Fiscal Impact Statement states every program, except for Bloomington's, was created after 2000.

[12] A new version of House Bill 1403 was then introduced which included the Fee Restriction still in place today: "A political subdivision may impose on an owner or landlord of a rental unit an *annual* registration fee of not more than five dollars ($5)." *Id.* at 177 (HB 1403 Amended Version Sec. 6) (emphasis added). This proposed amendment—applicable to all political subdivisions— allowed a political subdivision to register rental units but restricted it to imposing a yearly fee of not more than five dollars. This proposed version of the statute was later amended to add an exemption to the Fee Restriction: "This [Fee Restriction] section does not apply to a political subdivision with a rental registration or inspection program created before July 1, 1984." *Id.* at 183. With this latest amendment, political subdivisions with programs falling within the Fee Exemption were not subject to the Fee Restriction and could therefore charge an annual registration fee of more than five dollars. LSA issued a new Fiscal Impact Statement noting that of the fourteen previously noted cities or towns with rental registration programs, "[t]wo of those programs, Bloomington and West Lafayette, would not be affected by the proposed changes to the law as they were established prior to July 1, 1984." *Id.*

at 187.[5]  Hammond was not mentioned in the Fiscal Impact Statement despite its inspection program starting in 1961.

[13]  The bill as enacted and effective June 30, 2014, reads, in pertinent part:

> (a) This section does not apply to a political subdivision with a rental registration or inspection program created before July 1, 1984.
>
> (b) This chapter does not prohibit a political subdivision from establishing and enforcing a registration program for rental units within the political subdivision.
>
> (c) A political subdivision may impose on an owner or landlord of a rental unit an annual registration fee of not more than five dollars ($5).
>
> (d) A registration fee imposed under subsection (c) covers all the rental units in a rental unit community.  However, if a rental unit is not part of a rental unit community, a registration fee may be imposed for each separate parcel of real property on which a rental unit is located.
>
> (e)  If the ownership of a rental unit community or the ownership of a parcel of real property on which a rental unit is located changes, a political subdivision may require the new owner of the rental unit community or new owner of the real estate parcel to:

---

[5] Although the chart included in the Fiscal Impact Statement says West Lafayette's rental certificate program began in 2005, statements before the Interim Study Committee indicated West Lafayette created its inspection program in 1976.  App. to Br. of Appellant, Vol. III at 192.  Regardless of the date in the Fiscal Impact Statement, it appears undisputed that West Lafayette's program qualifies for the Fee Exemption.

> (1) pay an annual registration fee of not more than five dollars ($5); and

> (2) provide updated registration information to the political subdivision;

not later than thirty (30) days after the change of ownership.

Ind. Code § 36-1-20-5 (2014). It is under this version of the statute the Hammond-HKP dispute initially arose.

## D. 2015 – HEA 1165

### *Amendment to the Definition of "Rental Registration and Inspection Program"*

[14]  House Bill 1165 proposed amending section 36-1-20-5 so that the Fee Exemption applied only to "a political subdivision with a rental registration or inspection program *created after July 1, 1977*, and before July 1, 1984." App. to Appellant's Br., Vol. II at 211 (HB 1165 Introduced Version Sec. 6) (emphasis on added language). LSA's Fiscal Impact Statement for this bill noted the proposed amendment would mean Bloomington's program, which began in the early 1970s[6] and charges about $75, would be subject to the Fee Restriction. *Id.* at 215.

---

[6] Statements before the Interim Study Committee on Economic Development in 2013 suggested that Bloomington's program began in 1961. *See* App. to Br. of Appellant, Vol. III at 192.

Also, up to this point, Indiana Code chapter 36-1-20 had incorporated the definitions in Indiana Code chapter 32-31-3. Ind. Code § 36-1-20-1. Indiana Code section 32-31-3-8(2)(C) defines a "rental unit" to include a "rooming house." HB 1165 proposed adding the following definition of "rental registration or inspection program" to Indiana Code chapter 36-1-20:

> As used in this chapter, "rental registration or inspection program" means a program authorizing the registration or inspection of rental units and no other type of dwelling. The term does not include a general housing registration or inspection program.

App. to Br. of Appellant, Vol. II at 208 (HB 1165 Introduced Version Sec. 2). And a "rental unit" would be defined as:

> (1) a structure, or the part of a structure, that is used as a home, residence, or sleeping unit by:
> 　　(A) one (1) individual who maintains a household; or
> 　　(B) two (2) or more individuals who maintain a common household; or
> (2) any grounds, facilities, or area promised for the use of a residential tenant, including the following:
> 　　(A) An apartment unit.
> 　　(B) A mobile home space.
> 　　(C) A single or two (2) family dwelling.

*Id.* at 209 (HB 1165 Introduced Version Sec. 3). The result of these amendments would be that a "rental registration or inspection program" as defined for purposes of chapter 36-1-20 included programs that only inspected rental units and not rooming houses or boarding houses. LSA's Fiscal Impact

Statement noted the number of units subject to rental registration fees in political subdivisions may be reduced with the elimination of rooming houses and boarding houses from the definition. Bloomington's rental inspection program includes the inspection of rooming houses. *Id.* at 222 (Bloomington Municipal Code § 16.02.020 defining a rental unit as "any dwelling unit, rooming house, or rooming unit occupied by a person(s) other than the owner and/or their legal dependent") and 225 (Bloomington Municipal Code § 16.03.040(a) requiring "[e]ach residential rental unit" to receive an inspection). West Lafayette's rental certificate program defines rental housing to include a "rooming unit." App. to Br. of Appellant, Vol. IV at 167 (West Lafayette City Code § 117.02(n) defining rental housing as "any room, dwelling unit, rooming unit or portion thereof let or intended to be let to a family or person for compensation"). Hammond's ordinance defines "rental housing" to include a "rooming unit." Hammond City Code § 96.151.

[16] Ultimately, the date range for the Fee Exemption was abandoned, and section 36-1-20-5 remains as it was in 2014, imposing a fee restriction on political subdivisions unless they had a rental registration or inspection program prior to July 1, 1984. The only change made by HEA 1165 to Indiana Code chapter 36-1-20 was to add a definition for a "rental registration or inspection program" – a definition, notably, that is different than originally proposed. As enacted retroactively to January 1, 2015, Indiana Code section 36-1-20-1.2 states, in pertinent part:

As used in this chapter, "rental registration or inspection program" means a program authorizing the registration or inspection of only rental housing. The term does not include a general housing registration or inspection program or a registration or inspection program that applies only to rooming houses and hotels.

Ind. Code § 36-1-20-1.2. This means that to qualify as a "rental" program, the program must apply to all rental properties and to only rental properties. The effect of the 2015 legislation was that Bloomington and West Lafayette continued to qualify for the Fee Exemption because their programs applied only to rental housing. But Hammond no longer qualified for the Fee Exemption on two fronts. First, relevant to the first sentence of the newly-added definition, Hammond's program permits the inspection of non-rental housing. *See* App. to Br. of Appellant, Vol. II at 101 (Section 2.1 of Hammond's 1961 ordinance authorizing inspections of "dwelling units, rooming units, and premises" in Hammond). Second, relevant to the second sentence of the definition, Hammond's inspection program is both a permissive general inspection program and a mandatory hotel and rooming house inspection program. *See id.* at 108 (Section 9.2(A) of Hammond's 1961 ordinance requiring inspection of every hotel and rooming house in Hammond twice a year).

## E. Summary of Legislative Changes

[17] Beginning in 2011, the General Assembly began regulating political subdivisions' rental registration and inspection programs. The original proposed legislation would have barred registration programs and therefore

registration fees altogether, but that proposal was rejected. Instead, the General Assembly allowed registration programs and restricted the fees that could be charged to five dollars annually for a rental unit community unless the program was created prior to July 1, 1984, and fit a specific definition. Several proposed amendments that would have excluded Bloomington in particular from the Fee Exemption were abandoned. The result of the legislative amendments is that every political subdivision but Bloomington and West Lafayette are subject to the Fee Restriction. Hammond's City Controller submitted an affidavit in which she noted the consequences of the legislative changes for Hammond's rental registration and inspection program:

> 8. Hammond employs six full time inspectors, who conduct inspections of rental properties.
> 9. Hammond also employs part time inspectors.
> 10. Hammond also incurs costs and expenses for supplies necessary to run the rental inspection and registration program.
> 11. The cost of administering the rental registration and inspection program exceeds the revenue that Hammond receives from rental registration fees.
> 12. Even when Hammond charged a rental registration fee of $80, the revenue generated from that fee did not fully cover the costs of administering the program . . . .
> 13. After Hammond was forced to reduce its rental registration fee from $80 to $5, the amount of rental registration fees that Hammond has collected has declined by almost 90%.
> 14. This reduction will create [sic] budget shortfall for Hammond's rental registration and inspection program of over $700,000.

App. to Br. of Appellant, Vol. V at 149.[7]

# III. The Dispute

[18]    HKP is the management company for two rental communities in Hammond, Golden Manor Apartments and Saxony Townhomes. On May 20, 2014, Hammond sent letters to HKP seeking to collect a total of $85,840 in 2014 rental registration fees that had not yet been paid for those two properties.[8] *See* App. to Br. of Appellant, Vol. II at 198-99 (letter regarding Golden Manor, seeking $6,400 in registration fees and $40,000 in late fees) and 200-01 (letter regarding Saxony, seeking $5,440 in registration fees and $34,000 in late fees). HKP's regional manager replied by email on June 2, 2014, acknowledging receipt of the letters:

> The delay in payment was to determine if the fees of $80 per unit would be pro-rated due to the changes that HB 1403 brought about with regard to rental registration fees. The fees are for 2014 but will significantly reduce after 6-30-14 so I am sure you can understand why we worked to determine what, if any portion of the fees would be pro-rated.

---

[7] Because of restrictions on inspections of rental housing in Indiana Code section 36-1-20-4.1, Hammond could not simply increase the fee it charges for inspections in order to make up for this shortfall.

[8] Section 96.152(A) of Hammond's City Code provides that any owner of real property that is used as rental housing in the city is required to register the property annually by April 15. Section 96.152(F) provides for a $500 per unit late fee for each rental unit not registered by April 15.

*Id.* at 203. HKP's corporate counsel also replied to Hammond by letter dated

June 6, 2014:

> Please note that HKP disputes the validity of the alleged debts of
> $39,440.00 and $46,400.00 as set forth in your May 20th letters,
> and in fact, a hearing with the Hammond Board of Public Words
> and Safety has been scheduled for July 3, 2014 to address this
> specific issue.

> HKP is hopeful to have a resolution to this dispute as the result
> of or before the July 3, 2014 hearing, and as such, would request
> that your offices forego any further collection or other litigation
> efforts at this time and pending the determination that is issued
> with regard to the upcoming hearing.

*Id.* at 205.

[19]    Before the July 3 hearing, Hammond filed a declaratory judgment action.[9] The

complaint alleges, in pertinent part:

> 7. On or about March 26, 2014, Governor Mike Pence signed
> House Enrolled Act 1403 ("HEA 1403") into law. HEA 1403
> amended several sections of the Indiana Code concerning local
> government, and added a few sections as well. . . .

> 8. HEA 1403, Section 5 is the section relevant to this Complaint,
> and effective June 30, 2014, will be added to the Indiana Code as
> a new section, Indiana Code § 36-1-20-5. HEA 1403, Section
> 5(c) states: "A political subdivision may impose on an owner or

---

[9] The original complaint was allegedly filed June 23, 2014, but is not included in the record. The following comes from the first amended complaint, filed September 15, 2014. There is no indication what was amended from the original to the first amended complaint.

landlord of a rental unit an annual registration fee of not more than five dollars ($5)." HEA 1403, Section 5(c), therefore purports to cap Indiana political subdivisions' annual rental registration fees at $5 per rental unit. An exemption is provided, however, to a "political subdivision with a rental registration *or* inspection program created before July 1, 1984." HEA 1403, Section 5(a) (emphasis added).

9. Hammond created a rental inspection program in 1961 by enacting Hammond Ordinance Number 3337 . . . . Specifically, Ordinance 3337 authorized and directed Hammond's Health Officer and/or Fire Inspector and/or the Building Commissioner ("Inspection Officials") to "make inspection to determine the condition of dwelling units, rooming units, and premises located within the City of Hammond . . . ." Dwelling units and rooming units are defined, so that they encompass rental property as well as purchased property. . . .

10. Thereafter, in 2001, Hammond created a rental registration program by enacting Hammond Ordinance Number 8327 . . . . This Ordinance required all "rental housing units" to register annually and pay a $5 annual fee for "each dwelling or rooming unit." Four ordinances since 2001 have amended Hammond's rental registration program. . . . The most recent amendment, Ordinance 9060, enacted in 2010, changed the annual registration fee from $10 to $80. . . .

11. Based on the foregoing, Hammond created a rental inspection program before July 1, 1984, and its rental registration program after that date. Because Hammond is "a political subdivision with a rental registration *or* inspection program created before July 1, 1984," HEA 1403, Section 5(a) (emphasis added), Hammond's current rental registration program, which requires an $80 per unit annual registration fee, qualifies for the exemption from the $5 per unit cap on rental registration fees in HEA 1403, Section 5(c).

12. . . . In 2014, [HKP] has refused to pay the $80 per unit annual registration fee for Saxony Townhomes and Golden Manor Apartments because it contends that the $80 fee conflicts with the $5 cap on rental registration fees in HEA 1403, Section 5(c). . . . In other words, [HKP] disputes Hammond's position that Hammond is entitled to the exemption in HEA 1403, Section 5(a) from the $5 cap.

*Id.* at 23-25. Accordingly, Hammond sought a declaration that:

(1) the exemption under HEA 1403, Section 5(a) applies to any Indiana political subdivision that created either a rental inspection program or a rental inspection [sic] program before July 1, 1984; and (2) Hammond's current rental registration program, therefore, qualifies for the exemption under HEA 1403, Section 5(a), is lawful under HEA 1403, and can continue to be implemented and enforced against all rental property owners and managers in Hammond, including but not limited to [HKP] . . . .

*Id.* at 26.

[20]     After HEA 1165 was enacted in 2015 amending the definition of "rental registration or inspection program," Hammond amended its complaint. Count I still sought a declaration that in 2014, Hammond qualified for the Fee Exemption and HKP could not dispute the 2014 registration fees owed. Hammond alleged the enactment of HEA 1165 "confirms that Hammond qualified for the Fee Exemption in 2014. If Hammond did not, the Legislature would have seen no need to enact HEA 1165 to disqualify Hammond from the Fee Exemption beginning in 2015." *Id.* at 91. Newly added Counts II and III alleged the 2015 version of Indiana Code section 36-1-20-5 violated the Indiana

Constitution. Count II alleged a violation of Article 4, Section 22 prohibiting special laws "[r]elating to fees or salaries." Count III alleged a violation of Article 4, Section 23 requiring that "in all . . . cases where a general law can be made applicable, all laws shall be general . . . ." In both cases, Hammond alleged that the Fee Exemption in section 36-1-20-5(a) could not be severed from the remainder of the section.

[21] Both Hammond and HKP filed motions for summary judgment. Hammond's position was that its rental inspection program was created prior to July 1, 1984, and it therefore qualified for the Fee Exemption in 2014 but the legislative history of the statutory amendments shows the Fee Exemption was intended to benefit only Bloomington and West Lafayette to the exclusion of all other political subdivisions and that the 2015 amendment finally accomplished that. Hammond contended the legislation is unconstitutional special legislation because the legislation creates non-uniform rental registration fees throughout the state when laws of general applicability could be made. HKP took the position that 1) Hammond did not have a rental registration or inspection program that was created before July 1, 1984, as that term is now defined, and was therefore not entitled to the fees it requested for 2014; 2) Hammond lacks standing to raise its constitutional claims based on precedent from our supreme court; 3) the "fees" referred to in Article 4, Section 22 are fees collected by public officials to compensate them for their services, not the "fees" implicated by this case; 4) the Fee Exemption is constitutional general legislation; 5) the Fee Exemption constitutes a commonly used grandfather clause that has never

been considered special legislation; 6) even if it is special legislation, it is nonetheless constitutional, justified by the special characteristics of Bloomington and West Lafayette; and 7) if the Fee Exemption is unconstitutional, it is severable from the rest of the statute.

[22] In addition, the Indiana Attorney General was permitted to intervene in this action for the "limited purpose of defending the constitutionality of Indiana's laws, to the extent they are called into question." App. to Br. of Appellant, Vol. III at 67. The State of Indiana filed a Memorandum of Law in Support of the Constitutionality of Indiana Code Section 36-1-20-5 mostly aligned with HKP's position. The State, like HKP, first asserted Hammond lacks standing. Unlike HKP, however, the State acknowledged the statute was special legislation, but argued it was nonetheless constitutional as it was based on inherent characteristics of Bloomington and West Lafayette, primarily the high rate of renter-occupied housing as compared with other political subdivisions with rental registration or inspection programs.

[23] Following extensive briefing by the parties and the State, the designation of numerous exhibits as evidence on both sides, and a hearing, the trial court issued an order on August 29, 2016, granting summary judgment to Hammond on Count I of its complaint upon concluding Hammond was entitled to the registration fees it sought from HKP for 2014.[10] The trial court also granted

---

[10] HKP does not appeal this ruling. The only issue before the court on appeal concerns the constitutionality of Indiana Code section 36-1-20-5. Findings and conclusions related to Count I have been omitted below.

summary judgment to HKP on Counts II and III of Hammond's complaint upon concluding Indiana Code section 36-1-20-5 is constitutional special legislation. Specifically, with respect to Counts II and III the trial court concluded:

A. Hammond has standing.

1. HKP and the State contend that Hammond does not have standing to bring Counts II and III. . . . Hammond brought its suit under the Declaratory Judgment Act ("Act").

* * *

4. HKP and the State argue that *Howard County v. Kokomo City Plan Comm'n*, 330 N.E.2d 92 (Ind. 1975), forecloses Hammond's standing to bring Counts II and III. But in *Howard County*, the county did not allege that it had suffered any injury. Here, Hammond alleges an injury. And in *Howard County*, the county was not attempting to uphold the challenged validity of its ordinance. Here, Hammond is attempting to uphold the challenged validity of its ordinance, and in *Indiana Dep't of Nat. Resources v. Newton Cnty.*, 802 N.E.2d 430, 433 (Ind. 2004), the Supreme Court held – based on *Howard County* – that a county had standing to "uphold[] the challenged validity of its ordinances." Moreover, the Court of Appeals has rejected HKP and the State's broad reading of *Howard County* – "*Howard County* does not hold a county may not seek to invalidate a statute; rather, a county cannot do so in the absence of any injury to the county itself." *Marion Cnty. v. State*, 888 N.E.2d 292, 297 (Ind. Ct. App. 2008).

5. Hammond's rights, status, and legal relations have been affected. So, Hammond has standing to bring all of its claims

under the Act, and it seeks to uphold the validity of its challenged ordinance. So, it has standing under *Newton County*.

\* \* \*

C. The Fee Exemption is special legislation.

9. In Counts II and III, Hammond alleged the Fee Exemption is special legislation in violation of Ind. Const. Art. IV Sections 22 and 23. During briefing, the State conceded that the Fee Exemption is special legislation. HKP argues the Fee Exemption is a standard grandfather clause.

10. "The determination of whether a law is special or general is a threshold question in determining its constitutionality under both Article IV, Section 22 and Section 23." A law is "special if it is designed to operate upon or benefit only particular municipalities."

\* \* \*

12. The Fee Exemption singles out a smaller group for special treatment and is special legislation. Until 2013 . . ., all political subdivisions could charge rental registration fees of any amount. At least ten municipalities had fees of more than $5. In 2014, the Fee Exemption limited the political subdivisions that could charge more than $5 to those with "a rental registration or inspection program created before July 1, 1984. . . ." It appears the Legislature used the 1984 date to single out a group (Bloomington and West Lafayette) smaller than the previously specified class (all political subdivisions) to receive a special benefit (the Fee Exemption), making the Fee Exemption special legislation.

\* \* \*

15.  Despite this evidence, HKP contends the Fee Exemption is a standard grandfather clause.  The actions the Legislature took after Hammond filed this suit undermine this contention.  "A statute is 'special' if it '*pertains to and affects a particular case*, *person, place, or thing, as opposed to the general public.*"  After Hammond filed this suit, the Legislature attempted to affect this case and remove Hammond from the Fee Exemption in four ways.  The first two efforts accidentally removed Bloomington from the Fee Exemption, so they were dropped.  The last two efforts succeeding in removing only Hammond, and they were a clear effort to affect this case, demonstrating that the Fee Exemption is special legislation.

\* \* \*

D.  The Fee Exemption does not violate Ind. Const. Art. IV, Sec 22.

18.  In Count II . . ., Hammond alleges that the Fee Exemption violates Article IV, Section 22, prohibiting "local or special laws . . . [r]elating to fees or salaries, except that the laws may be so made as to grade the compensation of officers in proportion to the population and the necessary services required."

19.  The term "fees" used in Section 22 refers to the nineteenth century "fee system" of using fees collected by county officers . . . to compensate them directly.  In the 1890's, the State abrogated this "fee system," and all county officials were instead compensated by salaries.

20.  Accordingly, the "fees" referenced in Article IV, Section 22 are fees paid directly to county officials as compensation.

However, the annual rental registration fee regulated by Indiana Code § 36-1-20-5 is not paid directly to county officials as "salary" or compensation; rather, it is directed to a special fund. Therefore, the fee limitation at issues does not regulate a "fee" as contemplated by Article IV, Section 22. HKP is therefore entitled to judgment as a matter of law on Count II.

E.  Ind. Code 36-1-20-5 does not violate Section 23.

21.  In Count III . . ., Hammond alleges the Legislature used the July 1, 1984 cut-off date in the Fee Exemption to exempt only Bloomington and West Lafayette from the Fee Restriction of Subsection 5(c).  Hammond contends this violates Article IV, Section 23 of the Indiana Constitution, which requires that "in all . . . cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the State." To be unconstitutional under Section 23, "a law must not only be special but subject to a law of general applicability."  The test is "whether there is something about the class [created by the special law] that makes it unique and whether that uniqueness justifies the differential treatment."

22.  Bloomington and West Lafayette are unique in ways that justified their exemption from the Fee Restriction.  The housing markets in Bloomington and West Lafayette are dominated by rental housing like nowhere else in the state, giving the owners of rental properties in those cities unique leverage in their housing markets.  At the same time, as relatively small cities with large numbers of college students living in them, Bloomington and West Lafayette have a unique pool of tenants – young, unsophisticated, first-time renters.  With inspection programs, they ensured the landlords provided safe, habitable rental housing to their inexperienced tenant populations; with registration programs, they ensured the landlords could be identified and held accountable for housing-code violations. Unlike other cities in the state, Bloomington and West Lafayette

have for decades imposed the costs of their special oversight on the landlords themselves.

23.  It is at least conceivable that the Legislature, by enacting the Fee Exemption of Ind. Code § 36-1-20-5(a), decided that the unique circumstances of the housing markets in Bloomington and West Lafayette justified exempting them from the Fee Restriction imposed by Subsection 5(c).  Therefore, Hammond has not satisfied its burden of negating "every conceivable basis which might have supported the classification."  Accordingly, Ind. Code § 36-1-20-5 is constitutional special legislation under Article IV, Section 23, and HKP is entitled to judgment as a matter of law on Count III . . . .

App. to Br. of Appellant, Vol. IX at 239-46 (some citations omitted).  After the trial court denied Hammond's motion to correct error, Hammond initiated this appeal.

# Discussion and Decision[11]

## I.  Summary Judgment Standard of Review

[24]  When reviewing the grant or denial of summary judgment, we apply the same test as the trial court: summary judgment is appropriate only if the designated evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Ind. Trial Rule 56(C); *Sedam v. 2JR*

---

[11] We heard oral argument on this case on December 12, 2017, in Indianapolis, Indiana.  We commend counsel for their excellent written and oral advocacy.

*Pizza Enterps., LLC*, 84 N.E.3d 1174, 1176 (Ind. 2017). Our review is limited to those facts designated to the trial court, T.R. 56(H), and we construe all facts and reasonable inferences drawn from those facts in favor of the non-moving party, *Meredith v. Pence*, 984 N.E.2d 1213, 1218 (Ind. 2013). On appeal, the non-moving party carries the burden of persuading us the grant of summary judgment was erroneous. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). A grant of summary judgment will be affirmed if it is sustainable upon any theory supported by the designated evidence. *Miller v. Danz*, 36 N.E.3d 455, 456 (Ind. 2015).

[25] "Specific findings and conclusions by the trial court are not required, and although they offer valuable insight into the rationale for the judgment and facilitate our review, we are not limited to reviewing the trial court's reasons for granting or denying summary judgment." *Doe v. Donahue*, 829 N.E.2d 99, 106 (Ind. Ct. App. 2005), *trans. denied*, *cert. denied*, 547 U.S. 1162 (2006). In addition, the "[f]act that the parties [made] cross-motions for summary judgment does not alter our standard of review. Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law." *Id.* (citation omitted).

[26] Finally, as this proceeding concerns the constitutionality of a statute, we note that a statute is "clothed with the presumption of constitutionality until clearly overcome by a contrary showing." *Zoeller v. Sweeney*, 19 N.E.3d 749, 751 (Ind. 2014) (citation omitted). We resolve all doubts in favor of the legislature, and where there are multiple possible interpretations of the statute, we will choose

the interpretation that upholds the statute. *State v. Buncich*, 51 N.E.3d 136, 141 (Ind. 2016). "To doubt the constitutionality of a law is to resolve in favor of its validity." *Henderson v. State*, 137 Ind. 552, 36 N.E. 257, 258 (1894).

## II. Standing

[27] We begin with the threshold question raised by both HKP and the State regarding whether Hammond has standing to pursue this constitutional challenge to Indiana Code section 36-1-20-5.[12] Although HKP agrees with the trial court's resolution that the Fee Exemption does not violate the Indiana Constitution, it urges affirming on the alternate ground of standing in furtherance of our policy of exercising judicial restraint in constitutional matters. *See Jones v. Jones*, 832 N.E.2d 1057, 1059 (Ind. Ct. App. 2005) (noting we must refrain from deciding constitutional questions when non-constitutional grounds are available for resolving the case).

[28] Standing "focuses on whether the complaining party is the proper person to invoke the court's power." *State ex rel. Cittadine v. Ind. Dep't of Transp.*, 790 N.E.2d 978, 979 (Ind. 2003). Only those who have a personal stake in the outcome of the litigation and who show they have suffered or are in immediate danger of suffering a direct injury have standing. *Id.*

---

[12] The State filed a Notice of Joining Appellee's Brief in this matter, noting HKP's brief "asserts the arguments that the Attorney General raised in the trial court" and declining to file a separate brief "in the interests of judicial economy and to avoid a duplication in briefing." References to HKP therefore include the State except where noted otherwise.

HKP cites *Bd. of Comm'rs of Howard Cty. v. Kokomo City Plan Comm'n*, 263 Ind. 282, 330 N.E.2d 92 (1975), as support for its position that Hammond does not have standing to bring this case. In *Howard County*, the Board of Commissioners of Howard County challenged a statute authorizing cities in counties with a population under 84,000 to exercise planning and zoning authority for two miles outside city boundaries without the consent of county commissioners. The county made several constitutional arguments that the population classification discriminated against residents of the county, invoking Article 4, Sections 22 and 23, among others. With respect to Article 4, the county claimed, "the residents of the contiguous area in counties such as Howard are thereby discriminated ageinst [sic] in their political and civil rights." *Id.* at 295, 330 N.E.2d at 100. Our supreme court noted the county "makes no claim that it, as a governmental entity, is injured by the statute, nor would such a claim stand up against the power of the State over its subdivisions." *Id.*

> When a governmental subdivision of the State receives a command from the Legislature to exercise or to refrain from exercising the police power in a particular manner or in a particular area of governmental concern, that governmental body is powerless to invoke . . . Art. 4, ss 22 and 23, against such a command on its own behalf, or on behalf of its citizens.

*Id.* The court determined that, although a state may act as parens patriae on behalf of its citizens, a county cannot. *Id.* at 101. "[S]ince a county has not been recognized as a sovereign which may protect its citizens," the county's

attempt to "represent the interests of individual residents to vindicate constitutional rights personal to them" fails for lack of standing to assert the claims of its residents. *Id.* at 295, 330 N.E.2d at 100-01; *see also Bd. of Comm'rs of Union Cty. v. McGuinness*, 80 N.E.3d 164, 170 (Ind. 2017) (affirming dismissal of county's complaint against the Indiana Department of Transportation for damage to septic systems of county residents because county did not aver a personal interest, only an interest on behalf of its citizens). HKP essentially asserts this case holds that under no circumstances may a political subdivision assert rights under Article 4, Sections 22 or 23, and states that in the forty-two years since this decision, "this holding has never been questioned, much less overturned." Brief of Appellee at 29.

[30] Although it may never have been explicitly overturned, the *extent* of the *Howard County* decision is indeed questionable. Where HKP would have *Howard County* apply under all circumstances in which an Article 4 claim is raised by a political subdivision, subsequent cases have clearly delineated a political subdivision's ability to challenge a state statute based on the nature of the injury alleged. In *State ex rel. State Bd. of Tax Comm'rs v. Marion Superior Court*, 271 Ind. 374, 377, 392 N.E.2d 1161, 1164 (1979), our supreme court, *citing Howard County*, stated, "A county or an official thereof possesses standing to challenge an interpretation or application of a statute if it can be demonstrated that the party is seeking the resolution of a legitimate controversy surrounding the operation of the statute." The court determined a county, through its county council and commissioners, had standing to maintain an action challenging a

State Board of Tax Commissioners determination regarding county property tax rates because the county "has a vital interest at stake [and i]t would be anomalous indeed for us to hold that a county or its officials cannot resolve in a court of law a bona fide dispute . . . over the application of a state statute." *Id.* at 378, 392 N.E.2d at 1165. In so holding, the court distinguished cases in which the complaining political subdivisions were denied standing because in those cases, the city or county complainant had no "personal" interest in the dispute. *Id.* at 377-78, 392 N.E.2d at 1165 (citing, *e.g.*, *Lentz v. Trustees of Ind. Univ.*, 248 Ind. 45, 221 N.E.2d 883 (1966), where the county assessor tried to challenge a decision of the State Tax Board as to a particular piece of property owned by a private entity).

[31] Similarly, in *Ind. Dep't of Natural Res. v. Newton Cty.*, 802 N.E.2d 430, 433 (Ind. 2004), the supreme court, again citing *Howard County*, decided the merits of a county's constitutional challenge to a statute that conflicted with a county ordinance, noting "the County has a legitimate interest in upholding the challenged validity of its ordinances just as it does in seeking interpretation of statutes that affect its governance."[13] And in *Marion Cty. v. State*, 888 N.E.2d 292 (Ind. Ct. App. 2008), Marion and St. Joseph Counties challenged the constitutionality of a state statute authorizing the State to recoup from counties

---

[13] The specific challenge in *Newton County* was to the constitutionality of a statute as a violation of separation of powers. *Id.* at 432.

a portion of its expenses in operating juvenile detention facilities.[14] The State sought an arrearage of approximately $75 million dollars from the counties. The State, citing *Howard County*, asserted that "with rare exceptions, a county and its government have no standing and are powerless to challenge the constitutionality of a state statute." *Id.* at 297. This court disagreed: "*Howard County* does not hold a county may not seek to invalidate a statute; rather, a county cannot do so in the absence of any injury to the county itself." *Id.* Because the counties "have a stake in the $75 million at issue in this case"— money that would be paid out of their own treasuries—the court held the counties had standing to pursue their claim. *Id.* at 298.

[32] More particularly, several cases since *Howard County* have addressed the merits of a political subdivision's Article 4, Sections 22 or 23 challenge to a statute if the political subdivision—rather than its constituents—had a direct stake in the outcome and was in danger of suffering a direct injury. *See, e.g.*, *Alpha Psi Chapter of Pi Kappa Phi Fraternity v. Auditor of Monroe Cty.*, 849 N.E.2d 1131, 1134 (Ind. 2006) (addressing the merits of a county's Article 4, Section 23 argument regarding the constitutionality of a statute requiring the auditor to waive the requirement to timely file an application for exemption of a university fraternity property from taxation); *Mun. City of S. Bend v. Kimsey*, 781 N.E.2d 683, 684 (Ind. 2003) (addressing the merits of a challenge under Article 4,

---

[14] The counties challenged the statute as a violation of Article 9, Section 2, requiring the General Assembly to provide "institutions for the correction and reformation of juvenile offenders."

Section 23 by the city of South Bend to a law applicable only to St. Joseph County allowing a majority of landowners in an affected area of the county to block annexation by a municipality). HKP posits that because standing was not addressed in *Alpha Psi Chapter* or *Kimsey*, it was likely waived by the opposing party failing to raise it. Nonetheless, Hammond itself stands to lose hundreds of thousands of dollars annually if it is restricted to collecting a five dollar annual rental registration fee due to the most recent iteration of Indiana Code section 36-1-20-5. *See* App. to Br. of Appellant, Vol. II at 170 (showing Hammond's fee revenue in 2011 was $851,899 and in 2012 was $862,384). Hammond is not seeking to represent the interest of any individual, group of individuals, or business in this litigation; rather, it is seeking to represent its own interests and uphold its own ordinance regarding rental registration. Because Hammond has a direct stake in the outcome of this litigation and will sustain a direct injury if the statute is upheld, Hammond has standing to raise these claims.

## III. The Indiana Constitution

[33] Section 22 of Article 4 prohibits enactment of various local or special laws regarding sixteen enumerated subjects. *Alpha Psi Chapter*, 849 N.E.2d at 1134. Section 23 establishes a requirement of general laws where such can be made in all other cases. *Id.* Specifically, Article 4, Section 22 of the Indiana Constitution states:

> The General Assembly shall not pass local or special laws:
> * * *

> Relating to fees or salaries, except that the laws may be so made as to grade the compensation of officers in proportion to the population and the necessary services required . . . .

And Article 4, Section 23 of the Indiana Constitution states:

> In all the cases enumerated in [Section 22], and in all other cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the State.

[34] The determination of whether a law is special or general is a threshold question when analyzing its constitutionality under both Article 4, Sections 22 and 23. *Alpha Psi Chapter*, 849 N.E.2d at 1136. A statute is "general" if it applies to "all persons or places of a specified class throughout the state," and a statute is "special" if it "pertains to and affects a particular case, person, place, or thing, as opposed to the general public." *Kimsey*, 781 N.E.2d at 689 (citation omitted). "If the law is general, we must then determine whether it is applied generally throughout the State. If it is special, we must determine whether it is constitutionally permissible." *Id.* at 690 (quoting *Williams v. State*, 724 N.E.2d 1070, 1085 (Ind. 2000)).

[35] The State conceded below that the statute in question was a special law. *See* App. to Br. of Appellant, Vol. V at 56 (from the State's Memorandum of Law in Support of the Constitutionality of Indiana Code Section 36-1-20-5: "In this case, the statute at issue is permissible special legislation . . ."). HKP maintained below that the Fee Exemption was *not* special legislation just because fewer than all municipalities qualify; rather, HKP asserted the Fee

Exemption was "a common tool of statutory drafting" "to protect those who have relied on the law as it existed before a new statute takes effect": the grandfather clause. App. to Br. of Appellant, Vol. IV at 206, 208.[15] However, HKP has apparently abandoned this tack on appeal, and we will proceed, as the trial court did, under the assumption that Indiana Code section 36-1-20-5 is, indeed, special legislation, as it pertains to and affects a particular case and/or place. Our task, then, is to determine whether the law is constitutionally permissible. *Kimsey*, 781 N.E.2d at 690.

[36] Before discussing the constitutional questions, it is important to note that Hammond does not dispute the constitutionality of the Fee Restriction, as, in the absence of the Fee Exemption, it applies across the board to all political subdivisions. We also note the trial court found Hammond was entitled to the Fee Exemption in 2014 and granted Hammond summary judgment on its claim against HKP for approximately $86,000 in rental registration and late fees owed that year for its rental properties. HKP does not appeal this decision, and we proceed with the assumption that Hammond was entitled to the Fee Exemption as it existed in 2014. Additionally, Hammond does not argue that the 2014 iteration of the statute is unconstitutional special legislation – nor would it be expected to, as the Fee Exemption at that point also benefitted Hammond. It is not the Fee Exemption *per se* that troubles Hammond, then, but the Fee

---

[15] HKP argued in the alternative below as it argues now on appeal that even if the statute was special legislation, it was constitutional special legislation. *See id.* at 208.

Exemption in conjunction with the definition of "rental registration and inspection program" the legislature added in 2015. It is only when the legislature added the definition of "rental inspection or registration program" that excluded Hammond from the Fee Exemption that Hammond's alleged injury arose.

## A. Article 4, Section 22

[37] If a statute is special legislation relating to one of the sixteen enumerated subjects in Section 22, it is per se unconstitutional. *See State v. Lake Superior Court*, 820 N.E.2d 1240, 1249 (Ind. 2005) (holding two statutes applicable only to Lake County were unconstitutional upon finding they related to the assessment and collection of taxes, which is prohibited by Section 22), *cert. denied*, 546 U.S. 927 (2005). Hammond bases its Section 22 argument on the provision prohibiting the General Assembly from passing local or special laws relating to fees or salaries.

[38] HKP argues (and the trial court agreed) the "fees" referred to in Section 22 are only those fees which are used to *directly* compensate public officials for their services as they were in 1851 when Section 22 was written. *See State v. Hoovler*, 668 N.E.2d 1229, 1233 (Ind. 1996) (noting that in interpreting a provision of the Indiana Constitution, "we seek the common understanding of both those who framed it and those who ratified it") (quotation omitted). As explained in *Harter v. Bd. of Comm'rs of Boone Cty.*, 186 Ind. 301, 116 N.E. 304, 304 (1917), the "fee system" of compensating public officials meant officials collected

certain fixed fees for services required to discharge the duties of their office. *See also Cowdin v. Huff*, 10 Ind. 83 (1857) (explaining there were at that time three modes of compensating persons engaged in public service: fees, which are "compensation for particular acts or services"; wages, which are the "compensation paid . . . for services by the day, week, etc."; and salaries, which are "*per annum* compensation to men in official . . . situations"). "This system for compensating officials became so intolerable" that the legislature in 1891 replaced that system with a law fixing salaries applicable to county officers and fees to be collected for certain services, requiring the fees to be paid into the county treasury and salaries to be paid therefrom. *Harter*, 116 N.E. at 304-05.[16] A series of amendments to the fee and salary acts and cases challenging those laws followed until the supreme court in *Harmon v. Bd. of Comm'rs of Madison Cty.*, 153 Ind. 68, 54 N.E. 105 (1899), upheld the fee and salary acts against a Section 22 challenge. HKP argues the Fees and Salaries clause of Section 22 has since been dormant and cannot support Hammond's claim that the Fee Restriction is unconstitutional pursuant to this provision because "fees" no longer compensate county officers as they did when this section was enacted.

---

[16] When enacted in 1851, Section 22 originally prohibited special laws "in relation to fees and salaries." Because officials in larger and more populous counties provided more services, they collected more fees than officials in smaller counties, and Section 22 was amended in 1881 to add the provision that "laws may be so made as to grade the compensation of officers in proportion to the population and necessary services required." The section was further amended in 1984 as part of an overall revision "designed to make the Indiana Constitution more understandable through the use of modern language." *Gallagher v. Indiana State Election Bd.*, 598 N.E.2d 510, 513-14 (Ind. 1992), *cert. denied*, 506 U.S. 1081 (1993). The original introduction "in relation to" was changed to "relating to" during this comprehensive revision.

[39]  Hammond contends the Fees and Salaries clause survived the abolishment of the fee system of compensation and the legislature cannot now pass a special law governing the payment of fees of any type. Indeed, with the passing of the fee and salary acts, fees continued to be paid although they no longer directly compensated public officials and the validity of those fees was considered separately from salaries under Sections 22 and 23. For instance, in *State ex rel. McCoy v. Krost*, 140 Ind. 41, 39 N.E. 46 (1894), the court discussed whether the Lake County recorder could charge $1.25 for recording a mortgage when the law set a fee of $1.00. The recorder argued the fee and salary acts were unconstitutional under Sections 22 and 23 because, for some reason, the law had failed to provide a salary for the Shelby County recorder (and other public officials in Shelby County). The court, however, noted the question before it pertained only to the validity of the law prescribing a fee for recording mortgages, "unless it shall be found that the fee provisions and the salary provisions of the law are so interdependent as to cause the fall of either by the invalidity of the other. A full reading of the act will disclose that the system of fees provided therein is complete . . . ." *Id.* at 47; *see also State ex rel. Bd. of Comm'rs of Benton Cty. v. Boice*, 140 Ind. 506, 39 N.E. 64, 64 (1894) (citing *Krost* and noting *Krost* "held that the act should be considered as presenting a system of fees apart from the system of salaries also provided" and adding that "either system must stand, and its constitutional validity be determined, independently of the other"). The court in *Krost* held, notwithstanding any deficiencies in the salary law, the fee law was valid and prescribed a fee of one dollar for recording mortgages.

[40] HKP is correct that there has been no litigation on this point in over a hundred years. But that does not mean the constitutional provision is no longer in effect; in fact, it remains very much a part of Indiana's Constitution to this day. As noted above, in the early 1980s, the General Assembly, by joint resolution, undertook to amend the state constitution to update "certain antiquated style, language, or provisions." 1982 Ind. Acts P.L. 231. Had the legislature considered the Fees and Salaries clause of Section 22 "antiquated," it could have addressed it at that time. Amendments to thirty-four provisions of the constitution were proposed, including amendments to Section 22. And yet the only thing that was amended in the Fees and Salaries clause was the introductory language. We therefore cannot agree with HKP that the Fees and Salaries clause has no continued viability.

[41] HKP also points out that the fees prescribed in the 1890s' fee and salary acts were those paid to constitutional officeholders for services provided by the office, unlike the fees at issue herein. Again, this is correct, but a broader view of Section 22 and the cases that have construed it supports the notion that when the State sets a fee—any fee—it should apply uniformly. *Cf. Harmon*, 54 N.E. at 107 ("The state has the right to appoint such reasonable fees to be paid for official services as it sees fit [and t]he fees for such official services must be uniform throughout the state."). And here, the State has taken on the task of regulating the fee a municipality may charge for a service to landlords and tenants, but has not required the fee to be uniform across the state. In addition, the legislature has declared that rental registration fees must be maintained in a

special fund to be used only for reimbursing the costs of the registration and inspection programs. Ind. Code § 36-1-20-3. In this regard, the fees at issue herein are similar to the fees considered in the 1890s. The fees collected in the 1890s were used to pay the salaries of the officials collecting them; here, the rental registration fees are used to pay for the implementation and operation of the program assessing them, which would include the salaries paid to those running the program. *See* App. to Br. of Appellant, Vol. V at 148-49 (affidavit of Hammond City Controller noting the Hammond rental registration and inspection program employs six full time inspectors, part time inspectors, and incurs costs and expenses for supplies in running the program). No other program or expense is paid for or supported by the monies generated by this program.

[42] Section 36-1-20-5 relates to fees for rental registration programs and allows Bloomington and West Lafayette and *only* Bloomington and West Lafayette to charge a fee different than all other political subdivisions in the State. Section 36-1-20-5 therefore runs afoul of Article 4 Section 22, which prohibits special laws relating to fees or salaries. Because section 36-1-20-5 is unconstitutional under Section 22, we need not necessarily consider Hammond's alternative argument that the statute is unconstitutional under Section 23. However, in the interest of completeness, we do so below.

## B. Article 4, Section 23

[43] Even where a law does not address one of the Section 22 subjects, the residual clause of Section 23 requires it must nevertheless be general where a general law

can be made. *See* Ind. Const. Art. 4, sec. 23 (". . . in all *other* cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the State") (emphasis added); *Lake Superior Court*, 820 N.E.2d at 1245. Therefore, even if we had not found the rental registration and inspection fee to be subject to Section 22, it might still be unconstitutional under Section 23. In including the qualifying language—"where a general law can be made applicable"—the drafters expressed a preference for general laws while recognizing that special laws were sometimes necessary. *Indiana Gaming Comm'n v. Moseley*, 643 N.E.2d 296, 300 (Ind. 1994). "If the subject matter of an act is not amenable to a general law of uniform operation throughout the State, it is constitutionally permissible." *Buncich*, 51 N.E.3d at 141.

[44] Because all sides apparently now agree that section 36-1-20-5 is special legislation, *see* ¶ 35, *supra*; *see also Alpha Psi Chapter*, 849 N.E.2d at 1137 (the conclusion that a law is special is a threshold determination in analyzing a law's constitutionality), a review of Hammond's Section 23 claim calls upon us to determine only whether the statute is nevertheless permissible because the "relevant traits of the affected area are distinctive such that the law's application elsewhere has no effect" and it therefore cannot be made applicable generally, *Kimsey*, 781 N.E.2d at 692. In other words, we consider whether there is something about the class that makes it unique and whether that uniqueness justifies its differential treatment. *Alpha Psi Chapter*, 849 N.E.2d at 1138. Our courts have, on several occasions, found unique circumstances justifying differential legislative treatment. *See, e.g.*, *Buncich*, 51 N.E.3d at 142-43

(upholding statute applicable only to Lake County aimed at reducing the cost of election administration by consolidating small precincts based on that county's exceptionally high number of small precincts – both the highest number of small precincts in the state and more than twice as many as any other county); *Lake Superior Court*, 820 N.E.2d at 1250-51 (upholding tax reassessment statute based on Lake County's history of systemic underassessment); *Williams*, 724 N.E.2d at 1086 (upholding a statute providing for additional magistrates in Lake County superior courts because the need was objectively supported by a study comparing caseloads and finding Lake County, as a larger county with a larger docket, was in need of those judicial resources); *Hoovler*, 668 N.E.2d at 1233-35 (upholding statute allowing Tippecanoe County to increase certain taxes because it was the only county subject to Superfund liability); *Moseley*, 643 N.E.2d at 301-05 (upholding riverboat gambling statute that provided for voting by city rather than by county for Lake County alone because of the unique circumstances of its waterfront).

[45]     In other cases, we have found the proffered "unique circumstances" to be insufficient to warrant special legislation.  *See*, *e.g.*, *Alpha Psi Chapter*, 849 N.E.2d at 1137-39 (striking statute that allowed three particular fraternities at a single university to retroactively extend time to file for a property tax exemption because the only thing separating them from other fraternities at the university was their failure to timely file: "[u]ltimately, the taxpayers' argument boils down to a claim that they are unique because they, and they alone, require relief from the consequences of their own oversight"); *Kimsey*, 781 N.E.2d at

694 (striking annexation statute applicable only to St. Joseph County because neither "the need to preserve rural land around urban areas" nor the need to prevent competing cities from annexing each other's land was unique to that county).

[46] As Hammond points out, whether a general law can be made applicable is typically a hypothetical situation, because the law at issue in the typical case begins as a law granting special treatment to a small class. But in this case, it appears a statute was enacted as a general law and through the series of amendments detailed in the *Facts and Procedural History* section, *supra*, *became* a special law benefitting only Bloomington and West Lafayette. House Bill 1543 in 2011 allowed municipalities who already had rental registration and inspection programs to continue to charge fees of their choosing (and allowed other municipalities to implement fees of any amount), provided those fees were maintained in a special fund to be used only for running the program. Thus, until House Bill 1313 in 2013, any political subdivision could charge rental registration fees of any amount.[17] After the 2014 amendment added the Fee Restriction and Fee Exemption, every political subdivision but Bloomington, West Lafayette, and Hammond was restricted to charging a fee of five dollars based on a seemingly arbitrary date. And after the 2015 amendment changed the definition of "rental registration and inspection

---

[17] Recall that in 2013, HEA 1313 prohibited a political subdivision from adopting a regulation that imposed an inspection, registration, or other fee after February 28, 2013, allowing political subdivisions which already imposed a fee to continue, but not allowing political subdivisions to begin imposing a fee.

program," only Bloomington and West Lafayette were eligible for the Fee Exemption, and therefore only those two cities may charge fees of their choosing. This result was clearly intentional and not merely serendipitous because the series of amendments focused on drafting a statute that achieved this very result: that every political subdivision was subject to the Fee Restriction *but* Bloomington and West Lafayette.

[47] HKP argues Bloomington and West Lafayette are unique in ways that rationally justify the determination that they alone should be exempt from the Fee Restriction, citing their unique housing markets and "an unmatched history of employing rental registration and inspection programs to regulate all landlords . . . ." Br. of Appellee at 58; *see also* App. to Br. of Appellant, Vol. IX at 245-46 (trial court stating Bloomington and West Lafayette are unique because their housing markets are dominated by rental housing and their tenant pool is "young, unsophisticated, first-time renters" and they have for decades imposed the costs of oversight on landlords). But Hammond argues that these "unique characteristics" (while denying they are unique at all) existed in 2011, as well, and cannot suddenly justify allowing them to continue charging any fee they want while restricting all others to a five dollar fee. In fact, the reasons for singling out Bloomington and West Lafayette are primarily couched in terms of the characteristics of those cities and not necessarily by those possessed by the classification: a political subdivision with a rental registration or inspection program created before July 1, 1984 that does not have a general housing registration or inspection program or a registration or inspection program that

applies only to rooming houses and hotels.  Ind. Code §§ 36-1-20-5(a); 36-1-20-1.2.  Further, Hammond argues it is not just the Fee Exemption itself but the *process by which the Fee Exemption came into being* that demonstrates this is unconstitutional special legislation.  The legislative history of Indiana Code chapter 36-1-20 shows that language was offered and rejected until the statute was crafted into the legislation it is today, benefitting only Bloomington and West Lafayette.  Even LSA's Fiscal Impact Statements specifically point out the impact of various proposed bills on Bloomington and West Lafayette.

[48]  The subject of the law—rental registration fees—is amenable to a general law of uniform application throughout the state.  The conditions the law addresses—identification of landlords and protection of tenants—are found throughout the state.  But the law burdens political subdivisions on the basis of a seemingly random date and highly specific definitional terms.  The law began life as a law of general applicability, but, through a series of amendments, transformed into a law benefitting only two Indiana cities.  The purpose of limits on special legislation is to "prevent state legislatures from granting preferences to some local units or areas within the state . . . ."  *Kimsey*, 781 N.E.2d at 685 (citation omitted).  It appears that is exactly what happened here; the question is whether the alleged "unique circumstances" of Bloomington and West Lafayette are actually unique circumstances at all, and if so, whether those unique circumstances rationally justify the law allowing them, and them alone, to be exempt from the Fee Restriction.

[49]     In *Buncich*, our supreme court considered whether a law creating a committee in Lake County directed to identify small voting precincts amenable to consolidation was unconstitutional special legislation. The data available to the court showed that at the time the statute was enacted, Lake County had 525 precincts, 130 of which qualified as "small" (fewer than 500 active voters). 51 N.E.3d at 139. The number of small precincts in Lake County was more than double that of any other county (Allen County was next with fifty-eight out of 338), and was also more than the total number of small precincts in the other seven most populous counties (Marion, Allen, Hamilton, St. Joseph, Vanderburgh, Porter, and Elkhart Counties had 129 small precincts combined). *Id.* at 139, 143 n.11.

> The State argues Lake County is sufficiently distinct in that it has an exceptionally high number of small precincts, which impose significant and unnecessary costs on the election system. Buncich responds that nearly all of our counties have small precincts, and that taxpayers across the state could benefit from cost savings. We are thus confronted with a question of degree: Lake County is not unique merely because it *has* small precincts, but at what point does the sheer number of small precincts in Lake County become a defining characteristic such that it justifies special legislation?

*Id.* at 142-43 (footnotes omitted). The court concluded Buncich, who had the burden of proof as the party seeking to strike down the statute, had not met his burden of rebutting the presumption that the legislature had determined Lake County to be past the point at which the characteristic becomes defining. *Id.* at 143. The court also noted that the statute in question did not mandate a

solution to the unique circumstances but left the decision-making authority for how to handle the disproportionate number of small precincts at the local level. *Id.* Therefore, the court concluded "the abnormal number of small precincts in Lake County is a defining characteristic that is sufficiently distinctive to justify the Statute." *Id.*

[50] HKP seems to try to analogize this situation to the argument the State made in *Buncich*, contending the legislature was justified in crafting this special legislation because the "sheer number" of renters in general and renters of a certain age in particular in Bloomington and West Lafayette is a defining characteristic. Here, the alleged "unique characteristics" offered to justify the Fee Exemption being applicable to only Bloomington and West Lafayette are their positions as home to the largest college campuses in the state with the highest percentages of both rental housing generally and rental housing occupied by "unsophisticated, first-time renters" in particular, *see* Brief of Appellee at 20-21,[18] and "by far the longest history of regulating *all* landlords in their housing markets via rental registration and inspection programs," *id.* at 54. While it may be true those are circumstances unique to Bloomington and West

---

[18] A table compiled by HKP from 2014 United States Census Bureau data shows 65.7% of Bloomington's total occupied housing units are renter occupied and 52.4% of the total occupied housing units are renter occupied by non-family members fifteen to thirty-four years old. *Id.* at 21. Similarly, in West Lafayette, 68.8% of total occupied housing is renter occupied and 71.1% is occupied by non-family members fifteen to thirty-four years old. *Id.* The city with the next highest percentage of renter occupied housing is East Chicago, with 56.6%. *Id.* The city with the next highest percentage of renter occupied housing by non-family members aged fifteen to thirty-four is Muncie, with 37.2%. *Id.* Hammond's renter occupied housing units are 38.2% of its total occupied housing, with 12.6% occupied by non-family members aged fifteen to thirty-four. *Id.*

Lafayette, there is no obvious connection between those characteristics and the statute allowing those cities and those cities alone to charge any rental registration fee they want, while restricting all others to a very minimal fee. If the defining characteristic of Bloomington and West Lafayette is the large pool of "young, unsophisticated renters" in rental housing markets with dominant landlords, it is unclear how a statute allowing those cities to charge whatever they wish *and* allowing the landlords to pass that greater fee on to their allegedly vulnerable tenants is reasonably related to that characteristic.[19] Stated differently, the alleged "uniqueness" of Bloomington and West Lafayette does not justify exempting them from the Fee Restriction. Although HKP posited at the summary judgment hearing that the unique situation in Bloomington and West Lafayette "cries out for oversight," it also posited that while the legislature was imposing that oversight on other political subdivisions, it "could have reasonably decided that in [those] market[s] . . . we're going to cut them loose." Transcript at 61. That is not a meaningful explanation for why the rental housing markets in Bloomington and West Lafayette justify collecting a

---

[19] College students may be the majority people occupying rental housing in Bloomington and West Lafayette, but it is unlikely that landlords rent to young, presumably unemployed or minimally employed people without some sort of guarantee from a parent or other responsible party. Thus, the characteristics of the people occupying rental housing in Bloomington and West Lafayette are not necessarily indicative of the characteristics of the actual renters. Counsel for HKP acknowledged at oral argument that parents may have to sign for their children when renting an apartment. *See* https://mycourts.in.gov/arguments/default.aspx?&id=2161&view=detail&yr=&when=&page=1&court=app&search=&direction=%20ASC&future=False&sort=&judge=&county=&admin=False&pageSize=20 at 23:05-23:25.

registration fee of more than five dollars when all other political subdivisions are restricted to that amount.

[51] The purpose of Section 23 "is to prevent the legislature from providing a benefit to or imposing a burden on one locality and not others . . . ." *Buncich*, 51 N.E.3d at 141. The Fee Exemption in its current form is available only to political subdivisions with programs created before July 1, 1984, that authorize registration or inspection of all rental housing and only rental housing. Of the fourteen cities LSA identified as having rental registration or inspection programs in 2014—before the addition of the Fee Restriction and Fee Exemption—all of them charged a fee of more than five dollars. The statute now allows only two of those cities to continue to do so; whereas twelve of those cities will have to run their programs on even fewer dollars than before. The legislative history of section 36-1-20-5 shows the Fee Exemption was carefully crafted to provide a benefit to Bloomington and West Lafayette while burdening all other cities. *See Hoovler*, 668 N.E.2d at 1234 (the court noting it would not limit its consideration to the statute's language but also consider the circumstances surrounding the act in question in determining its constitutionality under Section 23). However, in so doing, the statute was not tailored to address the allegedly "unique circumstances" in Bloomington and West Lafayette; rather, those "unique circumstances" seem to have been hand-picked post hoc to justify the differential treatment imposed by the statute. *See Kimsey*, 781 N.E.2d at 694 (noting the several different explanations offered to justify a statute's application only in counties with population between 200,000

and 300,000 "were all couched in terms of characteristics of St. Joseph County, not necessarily those possessed by a county of this population size"); *see also Buncich*, 51 N.E.3d at 139 (the statute addressing the abnormally high number of small precincts in Lake County appointed a committee to identify the small precincts and determine if any adjoining precincts could be combined; thus, the statute directly addressed the defining characteristic). A general law regarding rental registration fees can be—and in fact was—made applicable across the state. By crafting this special law to exempt Bloomington and West Lafayette from that general law, the legislature has run afoul of Section 23.

## C. Severability

[52] As the Fee Exemption is unconstitutional special legislation, it must be stricken. Hammond argues the Fee Exemption is not severable from the remainder of the section and that the entire section, including the Fee Restriction, must be stricken.

> A statute bad in part is not necessarily void in its entirety. Provisions within the legislative power may stand if separable from the bad. But a provision, inherently unobjectionable, cannot be deemed separable unless it appears both that, standing alone, legal effect can be given to it and that the legislature intended the provision to stand, in case others included in the act and held bad should fall.

*State v. Monfort*, 723 N.E.2d 407, 415 (Ind. 2000) (quoting *Dorchy v. Kansas*, 264 U.S. 286, 289-90 (1924)). The test for severability is whether the legislature would have passed the statute had it been presented without the invalid

provisions. *Paul Stieler Enterps., Inc. v. City of Evansville*, 2 N.E.3d 1269, 1279 (Ind. 2014); *see* Ind. Code § 1-1-1-8(b)(1) (stating that "[e]xcept in the case of a statute containing a nonseverability provision, each part . . . of every statute is severable" and the invalidity of any provision does not affect the remainder unless "the remainder is so essentially and inseparably connected with, and so dependent upon, the invalid provision or application that it cannot be presumed that the remainder would have been enacted without the invalid provision"). "The inclusion of a severability clause creates a presumption that the remainder of the Act may continue in effect. The absence of a severability clause creates the opposite presumption: the Legislature intends the Act to be effective as an entirety or not at all." *Ind. Educ. Emp't Relations Bd. v. Benton Cmty. Sch. Corp.*, 266 Ind. 491, 365 N.E.2d 752, 762 (1977).

[53]　Standing alone and without the Fee Exemption, section 36-1-20-5 could be given legal effect as a law of general applicability. However, Indiana Code chapter 36-1-20 does not contain a severability clause. In the absence of a severability clause, the burden is on the supporter of the legislation to show the provisions involved are separable. *Id.* HKP looks to the legislative vote on House Bill 1403 to support its assertion that the Fee Exemption is not so essentially and inseparably connected with the Fee Restriction that the legislature would not have passed one without the other. HKP notes that the Fee Exemption had effect in only two House districts and two Senate districts but the Senate nonetheless passed HB 1403 by a vote of 34-12 and the House passed the bill 67-28. Accordingly, HKP contends "there is no basis to

conclude these large majorities would have vanished if Bloomington and West Lafayette were subjected to the Fee Restriction." Br. of Appellee at 77. The various proposed and actual amendments to the statute, however, indicate that from the beginning, the legislature did not intend for the Fee Restriction to apply to Bloomington and West Lafayette. House Bill 1403 was originally proposed with a one-time Fee Restriction applicable to all political subdivisions, then amended to an annual Fee Restriction applicable to all political subdivisions, and passed out of committee that way. *See* App. to Br. of Appellant, Vol. IV at 106. Representative Truitt, representing a district which includes portions of Tippecanoe County, then moved to amend the bill to include the Fee Exemption language. *See id.* at 108-09. The bill with the Fee Exemption then passed both houses and was signed by the governor. When House Bill 1165 was proposed with a definition of "rental registration and inspection program" that would have impacted Bloomington and West Lafayette's ability to qualify for the Fee Exemption, the definition was carefully amended so that Bloomington's and West Lafayette's programs would meet the definition but Hammond's would not, and only then was the statute passed, to be effective retroactively.

[54] Without the Fee Exemption, Bloomington and West Lafayette would be subject to the Fee Restriction, a result the legislature specifically avoided. We therefore agree with Hammond that the legislative history of the statute demonstrates the legislature would not have passed section 36-1-20-5 with the Fee Restriction had it been presented without the Fee Exemption.

Whether or not an invalid portion of a statute is severable ultimately rests on a judicial determination of legislative intent. *Kinslow v. Cook*, 165 Ind. App. 623, 628, 333 N.E.2d 819, 822 (1975). In determining legislative intent, we may properly consider the object which the legislature sought to accomplish via the legislation. *In re City of Mishawaka*, 259 Ind. 530, 533, 289 N.E.2d 510, 512 (1972). Here, to address the concern that escalating fees may impact the affordability of rental housing and be detrimental to professionally managed and developed rental communities, the legislature sought to restrict the rental registration fee all political subdivisions except Bloomington and West Lafayette could charge. Only the statute *with* the Fee Exemption could accomplish that. The Fee Exemption is not severable from the remainder of section 36-1-20-5, and therefore the entire section must be stricken.

# Conclusion

The special legislation at issue both relates to fees and salaries and could be made a law of general applicability. Therefore, it runs afoul of both Sections 22 and 23 of Article 4 of the Indiana Constitution. Because making the statute one of general applicability was not the legislature's intent, we conclude section 36-1-20-5 must be stricken in its entirety. The judgment of the trial court in favor of HKP on Counts II and III of Hammond's complaint for declaratory judgment is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

Reversed and remanded.

Riley, J., and Pyle, J., concur.