



FILED

Mar 15 2019, 11:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

I N   T H E

# Indiana Supreme Court

Supreme Court Case No. 19S-PL-148

## City of Hammond,
*Appellant (Plaintiff)*

–v–

## Herman & Kittle Properties, Inc.,
*Appellee (Defendant)*

and

## State of Indiana,
*Appellee (Intervenor)*

Argued: September 13, 2018 | Decided: March 15, 2019

Appeal from the Marion Superior Court,
No. 49D07-1601-PL-531
The Honorable Michael D. Keele, Judge

On Petition to Transfer from the Indiana Court of Appeals,
No. 49A04-1612-PL-2784

**Opinion by Chief Justice Rush**

Justices David, Massa, and Goff concur.
Justice Slaughter not participating.

**Rush, Chief Justice.**

Article 4, Section 23 of the Indiana Constitution forbids special legislation—laws that apply only to a specific class—if a general law can be made applicable. Our case law has underscored two important, but countervailing, points: while the drafters of the 1851 Constitution sought to curb the spread of special legislation throughout the state, special laws are sometimes necessary.

Our analysis of special legislation begins with the oft-stated presumption in favor of a statute's constitutionality. With that presumption in mind, we then determine whether the statute's proponent has met its burden to show that a general law cannot be made applicable. This burden is met by demonstrating that an affected class has unique characteristics that justify the particular form of differential treatment provided by the special law. Given the overarching presumption in favor of the law's constitutionality, this burden is low—but it is still a burden that the proponent of the law must meet.

Here, a special law singles out the cities of Bloomington and West Lafayette for preferential treatment. That law is the "Fee Exemption," a provision in Indiana Code section 36-1-20-5 that allows those cities to charge local landlords any amount to register rental properties. All other Indiana localities, meanwhile, are restricted to charging only $5 under another provision—the "Fee Restriction"—found in the same statute. The Fee Restriction was born of legislative concern that rental-registration fees statewide were negatively impacting housing affordability and rental development.

Unhappy with the special treatment afforded to Bloomington and West Lafayette, the city of Hammond challenged the Fee Exemption as unconstitutional under Article 4, Section 23. Hammond argues that the Fee Exemption is amenable to general applicability throughout the state. The city further argues that the Fee Exemption is not severable from the rest of Indiana Code section 36-1-20-5 and so the entire statute, including the Fee Restriction, must be struck down.

Both the State and Herman & Kittle Properties—a Hammond landlord—defend the Fee Exemption's constitutionality. They contend that the statute's special treatment is warranted by three characteristics unique to Bloomington and West Lafayette: the cities' high percentage of renter-occupied properties, their large universities that draw young and unsophisticated renters, and their long-running rental-fee programs. But simply pointing to these characteristics is not enough to overcome the burden placed on a law's proponents. The State and Herman & Kittle also needed to establish a connection between the cities' alleged uniqueness and the Fee Exemption—by explaining how the unique characteristics justify that special treatment. Since the law's proponents did not carry their burden here, the Fee Exemption is unconstitutional special legislation that must be struck down.

Although the Fee Exemption is unconstitutional, the remainder of Indiana Code section 36-1-20-5—including the Fee Restriction—remains in force. This is because, by statute, the absence of a nonseverability clause triggers a presumption in favor of severability that Hammond failed to overcome. Accordingly, the Fee Restriction operates statewide, limiting all political subdivisions' rental-registration fees—including those of Bloomington and West Lafayette—to no more than $5 per rental unit.

## Facts and Procedural History

In recent years, local programs that charge fees for required inspection or registration of rental units have become a subject of growing legislative interest. As more Indiana political subdivisions began enacting rental-fee programs, some established programs started raising their per-unit fees.

A flurry of legislative activity to regulate these programs eventually culminated in the current version of Indiana Code section 36-1-20-5. Two provisions of that statute operate in concert to restrict all municipalities from charging more than a $5 rental-registration fee—all except Bloomington and West Lafayette.

Hammond challenged the "Fee Exemption" provision of Section 36-1-20-5—the part that exempts the two cities from the $5 cap—as

unconstitutional special legislation. Before addressing the merits of that claim, we first turn to the relevant facts and complex legislative history that gave rise to the dispute.

## I.  Hammond's rental-fee programs

To protect the public health, safety, and general welfare of the city, Hammond created two programs—an inspection program and a rental-registration program. Both programs charge fees for rental units.

The inspection program was created in 1961. It authorized city officials to inspect all dwelling units—both owner-occupied and rented. And it specifically required a $5 annual inspection fee for hotels and rooming houses.[1]

Decades later, in 2001, Hammond created its rental-registration program. That program required owners of rental housing to register their units with the city and to pay a per-unit $5 annual registration fee. The city then increased the fee twice over the next ten years—to $10 in 2004, and to $80 in 2010.

The eight-fold increase was Hammond's response to the 2010 state constitutional amendment placing caps on property taxes, including a 2% cap on rental properties. That amendment led to substantial savings for landlords but also significantly strained many municipal budgets—especially for municipalities, like Hammond, whose tax bases were shrinking.

---

[1] The ordinance defined a rooming house as "any dwelling, or that part of any dwelling containing three or more rooming units, in which space is let by the owners or operator to persons who are not husband or wife, son or daughter, mother or father, or sister or brother of the owner or operator."

## II. Other rental-fee increases and legislative response

Hammond was not the only municipality to address fiscal restraints by way of rental-unit fees. East Chicago, Griffith, Munster, Nappanee, and Speedway adopted programs to increase rental-fee revenue before the tax caps went into effect. After 2010, Bloomington joined Hammond in raising rates; and Crown Point, Evansville, and Valparaiso started charging rental-unit fees.

### A. House Bill 1543

In 2011, the year after the tax caps took effect, the General Assembly introduced House Bill 1543, which added a chapter to the Indiana Code: Chapter 36-1-20, "Regulation of Residential Leases." As introduced, the bill included a provision that would have barred a number of rental-unit inspection fees and would have banned political subdivisions from requiring rental-unit registration.

That provision, however, was left out of the final bill. As enacted, Chapter 36-1-20 allowed cities to collect inspection and registration fees. *See* P.L. 212-2011, § 1 (codified at Ind. Code § 36-1-20-3 (Supp. 2011)). But the amount collected had to be placed "in a special fund dedicated solely to reimbursing the costs reasonably related to services actually performed by the political subdivision that justified the imposition and amount of the fee." *Id.* Notably, the new statute applied statewide and did not restrict how much municipalities could charge for rental inspections and registrations. *See id.*

### B. House Bill 1313

Two years later, in 2013, the General Assembly introduced House Bill 1313. This bill initially contained a provision barring local inspection and registration fees on rental units. But it too was removed, and the final bill instead placed an approximately one-year moratorium on imposing new, or increasing existing, inspection or registration fees. *See* P.L. 149-2013, § 1

(codified at Ind. Code § 36-1-20-4 (Supp. 2013)). It also directed that an interim study committee investigate the "regulation of residential leases by political subdivisions." *Id.* at § 2.

That fall, the committee heard testimony on the issue. One side was concerned that the fees were becoming too costly, negatively impacting housing affordability and new rental development. Yet others claimed that the fees charged were fair and reasonable, and that they failed to even cover program administration costs.

Among the fees' defenders were representatives from Bloomington and West Lafayette. A representative from Bloomington testified that its program began in 1961, that renters make up 67% of its housing market, and that the city's program protects the welfare of its citizens and the character of the city itself. West Lafayette representatives explained that the city has had an inspection program since 1976, the number of rental units is increasing, and the "program protects property and assures parents of students that housing is safe."

## C. House Bill 1403

Several months later, in January 2014, the General Assembly introduced House Bill 1403 to significantly amend Chapter 36-1-20. *See* P.L. 193-2014, §§ 2–9. In relevant part, the bill included a provision—the "Fee Restriction"—prohibiting a political subdivision from charging rental-registration fees over $5. About two weeks after the bill with the Fee Restriction was first read, a West Lafayette Representative introduced an amendment adding the "Fee Exemption." The Fee Exemption specified that the Fee Restriction would "not apply to a political subdivision with a rental registration or inspection program created before July 1, 1984." *Id.*

The Legislative Services Agency issued a fiscal impact statement analyzing the proposed legislation. The statement concluded, "[t]here are 14 cities or towns that have rental inspection programs . . . . Two of those programs, Bloomington and West Lafayette, would not be affected by the proposed changes to the law as they were established prior to July 1, 1984." Ultimately, House Bill 1403 was enacted with both the Fee

Restriction and the Fee Exemption. *See* P.L. 193-2014, § 8 (codified at Ind. Code § 36-1-20-5 (Supp. 2014)).

In May 2014, Hammond notified Herman & Kittle Properties that it owed around $86,000 in rental-registration fees and penalties for 2014 on two apartment complexes it operated in the city. Herman & Kittle refused to pay that amount: it cited the recently enacted Fee Restriction and contended that its rental-registration fees would "significantly reduce" after the Fee Restriction went into effect on June 30.

But Hammond disagreed. So the city filed a complaint, seeking a declaratory judgment that it could continue charging its $80 per-rental fee. It argued that its rental-fee program was not subject to the Fee Restriction's $5 cap because the Fee Exemption applied. Hammond pointed to the fact that it had created its inspection program in 1961—well before July 1, 1984.

### D. House Bill 1165

While Hammond's lawsuit was pending, the General Assembly introduced House Bill 1165, proposing two notable changes to Chapter 36-1-20: narrowing the Fee Exemption and supplying certain new definitions.

The bill initially proposed language that would have made the Fee Exemption applicable only to political subdivisions "with a rental registration or inspection program created after July 1, 1977, and before July 1, 1984." This would have removed Hammond from qualifying for the Fee Exemption because its inspection program began in 1961. But it would also have excluded Bloomington, "which began [its program] in the early 1970s," according to the relevant fiscal impact report.[2] Ultimately, the language narrowing the Fee Exemption was taken out.

---

[2] As stated earlier, a Bloomington representative testified before the study committee that the city's program began in 1961. For purposes of this decision, it is of no consequence that there is conflicting evidence in the record as to when Bloomington's program began.

Another part of the proposal that would have excluded Bloomington—along with Hammond—from the Fee Exemption was likewise rejected; this part had to do with the definitions of "rental registration or inspection program" and "rental unit." Those definitions determined the scope of the Fee Exemption, which applied only "to a political subdivision with a rental registration or inspection program created before July 1, 1984." The proposal sought to define "rental registration or inspection program" as "a program authorizing the registration or inspection of **rental units and no other type of dwelling**" (emphasis added). And its definition of rental units did not include rooming houses.

Since Hammond's program required inspection of rooming houses, it would not qualify for the Fee Exemption under the proposal. But neither would Bloomington's program, because it required inspections and registrations of each "residential renting unit"—a term explicitly defined by the city to include a "rooming house."

The final bill, though, did not adopt definitions that excluded all programs that inspected rooming houses. Instead, it adopted definitions that excluded Hammond's program—but not Bloomington's or West Lafayette's—from the Fee Exemption. Here's how: The enacted act defined a "rental registration or inspection program" as "a program authorizing the registration or inspection of only rental housing. The term does not include a general housing registration or inspection program or a registration or inspection program that applies only to rooming houses and hotels." P.L. 65-2015, § 1 (codified at Ind. Code § 36-1-20-1.2 (Supp. 2015)).

This excluded Hammond from the Fee Exemption on two fronts: (1) because it had a general inspection program that permitted the inspection of non-rental housing, and (2) because it required the inspection only of rooming houses and hotels. However, the amended language no longer excluded Bloomington because its program applied only to rental housing. So under the final bill, both Bloomington and West Lafayette qualified for the Fee Exemption, while all other political subdivisions were subject to the Fee Restriction—meaning only Bloomington and West Lafayette could charge a higher-than-$5 annual rental-registration fee.

## E. Constitutional challenges to the Fee Exemption

This legislation prompted Hammond to amend its complaint to add state constitutional claims challenging the Fee Exemption. Hammond argued that the Fee Exemption violated both Article 4, Section 22's prohibition of special laws relating to fees and Article 4, Section 23's prohibition of special legislation where a general law can be made. Hammond further argued that the Fee Exemption is not severable from the remainder of Indiana Code section 36-1-20-5. The State then intervened "for the limited purpose of defending the constitutionality of Indiana law."

On cross-motions for summary judgment, the trial court held that Hammond had standing to challenge the constitutionality of the Fee Exemption; Hammond qualified for the Fee Exemption in 2014; and although the Fee Exemption is special legislation intended to benefit only Bloomington and West Lafayette, it is nonetheless constitutional.

The Court of Appeals partially reversed the trial court, holding that the Fee Exemption does violate Article 4, Sections 22 and 23 of the Indiana Constitution. *City of Hammond v. Herman & Kittle Props.*, 95 N.E.3d 116, 120 (Ind. Ct. App. 2018). The panel also struck down all of Section 36-1-20-5, which included both the Fee Restriction and the Fee Exemption. *Id.* at 144.

Both the State and Herman & Kittle petitioned to transfer.[3] We now grant transfer, vacating the Court of Appeals opinion.[4] Ind. Appellate Rule 58(A).

---

[3] Because the positions of Herman & Kittle and the State essentially align, we'll refer to both parties collectively as "Herman & Kittle" for ease of reading.

[4] We summarily affirm the excellently crafted Court of Appeals decision that Hammond has standing to pursue its constitutional challenges. *See* Ind. Appellate Rule 58(A)(2).

## Standard of Review

The constitutionality of an Indiana statute and the propriety of summary judgment are both questions of law that we review de novo. *State v. Norfolk S. Ry.*, 107 N.E.3d 468, 471 (Ind. 2018); *Paul Stieler Enters. v. City of Evansville*, 2 N.E.3d 1269, 1272 (Ind. 2014).

## Discussion and Decision

The Indiana Constitution provides two provisions aimed at limiting special legislation, which is a law that "pertains to and affects a particular case, person, place, or thing, as opposed to the general public," *Mun. City of S. Bend v. Kimsey*, 781 N.E.2d 683, 689 (Ind. 2003) (quoting Black's Law Dictionary 890 (7th ed. 1999)). These provisions are Sections 22 and 23 of Article 4.

Section 22 prohibits special laws on specific topics, including "fees and salaries." Section 23 contains broader language and reads,

> In all the cases enumerated in [Section 22], and in all other cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the State.

Hammond maintains that the Fee Exemption is special legislation that violates both sections of Indiana's Constitution, and that the special legislation is not severable from the remainder of Indiana Code section 36-1-20-5. Herman & Kittle does not dispute that the statutory provision is special legislation—nor could it reasonably do so. After all, it's clear that the Fee Exemption "pertains to and affects" particular places, namely, Bloomington and West Lafayette. But Herman & Kittle does contend that the Fee Exemption is **constitutional** special legislation, or if it's not constitutional, it's at least severable.

After careful consideration, we hold that the Fee Exemption violates Article 4, Section 23.[5] Special legislation is constitutional only if an affected class's unique characteristics justify the differential legislative treatment. *See, e.g.*, *Kimsey*, 781 N.E.2d at 694. And that is not the case here. Although Herman & Kittle proffered justifications for the special law—specifically, that Bloomington and West Lafayette contain high percentages of renter-occupied properties, that they contain large universities and accordingly many young and unsophisticated renters, and that they have had long-running rental-fee programs—these reasons do not warrant the Fee Exemption's special funding mechanism for those two cities alone.

Even though the Fee Exemption is invalid and so must be struck down, it is severable from the remainder of Indiana Code section 36-1-20-5. This is because Hammond failed to rebut a statutory presumption in favor of severability. Thus, the Fee Restriction stands, and no municipality is spared from the $5 cap on rental-registration fees.

Deciding the constitutionality of special legislation is no easy task. It involves a consideration of Article 4, Section 23's historical underpinnings—which not only reveal a hard-fought battle to protect against the negative ramifications of special legislation, but also recognize the need for special laws under certain circumstances. And the provision's origins have shaped the framework that we apply to special-legislation challenges today: a framework that has evolved over time and entails meticulous analysis.

So to fully explain the holding we reach today, we begin with the intent behind framing and ratifying Article 4, Section 23. *See Paul Stieler*, 2 N.E.3d at 1272–73. To discern this intent, we "examin[e] the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our constitution, and case law interpreting the

---

[5] Given our resolution on Article 4, Section 23 grounds, we need not address Hammond's Article 4, Section 22 argument.

specific provisions." *Id.* (alteration in original) (quoting *Ind. Gaming Comm'n v. Moseley*, 643 N.E.2d 296, 298 (Ind. 1994)).

## I.   The history behind state constitutional limits on special legislation

Over a nineteen-day span in 1816, representatives met in Corydon, Indiana, where they framed and signed our State's first constitution. William W. Thornton, *The Constitutional Convention of 1850*, *in* Report of the Sixth Annual Meeting of the State Bar Association of Indiana 152, 152 (1902). The original framers knew that Hoosiers might wish to amend their work, so Article 8 provided for a vote every twelve years on whether a convention should be called to "revise, amend, or change the constitution." Ind. Const. of 1816, art. VIII, § 1. When this question was put to Indiana voters in both 1828 and 1840, the calling of a convention failed each time. Thornton, *supra*, at 153.

The lack of interest in amending the 1816 Constitution began to change with the election of Governor James Whitcomb in 1843. *Id.* at 153–54. In his inaugural address, Governor Whitcomb began the push for revision because of the "growing evils of excessive legislation." *Id.* at 153. He remarked, "It is of the greatest importance to the welfare of the people, that the laws should be generally known and well understood." *Id.* at 153–54. In response, the legislature did not call for a constitutional convention, but the judiciary committee conceded in a report that the constitution could be revised at any time, not just at the end of the constitutional period of twelve years. *Id.* at 154–55.

In December 1845, Governor Whitcomb again highlighted a need for constitutional change, because "[m]uch the greater part of the legislature is occupied in passing local and private acts, for most of which, it is well worthy of consideration whether ample provision can not be made by a few general laws." *Id.* at 155. The legislature responded, putting the question of calling a constitutional convention to the voters on the August 1846 ballot. *Id.* at 156.

The election was held, and more votes were cast in favor of holding a convention than against. *Id.* However, the 1816 Constitution required "a majority of all the votes given at such election" to call for a constitutional convention, Ind. Const. of 1816, art. VIII, § 1, and the governor and legislature interpreted this as requiring "a majority of all the votes cast at the election, regardless of the [votes cast on the] question of the convention." Thornton, *supra*, at 157. Because there were 126,123 votes cast in the governor's race, but only 62,018 votes cast on the question of holding a convention—with 33,175 Hoosiers voting in favor—the required "majority of all the votes cast" was apparently lacking, and the measure failed. *Id.* at 156–57.

Governor Whitcomb, however, did not quit. In 1848, he again emphasized the need for a constitutional convention to address "the growing amount of . . . our local and private legislation." *Id.* at 162–63. He further remarked, "[i]f calling a convention to amend the constitution were productive of no other result than furnishing an effectual remedy for this growing evil, it would be abundantly justified . . . ." *Id.* at 165. Notably, "special legislation" represented 91% of all bills passed in the following year's legislative session. Frank E. Horack, *Special Legislation: Another Twilight Zone*, 12 Ind. L.J. 109, 115 (1936).

The legislature again responded to the governor's plea, and the question of holding a constitutional convention was put on the August 1849 ballot. Thornton, *supra*, at 170. This time it passed. *Id.*

By the time the delegates met a little over a year later on October 7, 1850, it was clear that "[t]he prevention of special and private legislation was the most potent argument for revision." *Id.* at 177–78. Thus, throughout the 127-day convention, *id.* at 180, curtailing special legislation was a topic of great debate. During one such discussion, Delegate John Pettit of Tippecanoe County expressed his view that

> the laws should be general in every instance. Sir, if this is not done, you are just leaving undone the very thing which, most of all others, we are sent here to do—to cut down this whole system of local legislation, so that a man, in stepping over the boundary line of one county into another county, might not be

> under the painful uncertainty as to whether he was living under the same system of laws.

2 *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana* 1009, 1765–66 (Wm. B. Burford Printing Co. 1935) (1850) [hereinafter *2 Debates*]; 1 *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana* 4 (1850) [hereinafter *1 Debates*].

Pettit's remarks echoed those of Delegate David M. Dobson from the Owen and Green district, who said, "It should be remembered that the Legislature are to have no power of passing local laws; yet the power should be vested somewhere, and it should be done under a general law." *2 Debates*, *supra*, at 1765; *1 Debates*, *supra*, at 3. Pettit later explained the reasoning for Dobson's assertion: "our object ought to be to make our laws uniform, so that wherever a man treads the soil of Indiana, he shall have the same rights and privileges, and stand in all respects surrounded by the same laws, and be governed by them." *2 Debates*, *supra*, at 1767.

Delegates Pettit and Dobson were not alone. Convention President George W. Carr noted in his closing remarks that the newly drafted constitution provided "an effectual remedy for that most injurious evil in our legislation for many years past, known as local and special enactments." *Id.* at 2077; *1 Debates*, *supra*, at 4, 6. That remedy came in the form of Article 4, Sections 22 and 23, which represented the delegates' "attempt to prevent private and local legislation." Thornton, *supra*, at 189.

This history is telling. Special legislation drew an impassioned response, culminating in significant changes to our state constitution—including Article 4, Section 23, which is our focus today.

In the years following the 1850–1851 Convention, this section has remained unaltered: "In all the cases enumerated in [Section 22], and in all other cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the State." Ind. Const. art. 4, § 23. But the framework for analyzing and applying this provision has evolved over time. We now turn to that framework's development through case law.

## II. The evolution of special-legislation analysis

In the 1850's and 60's, our Court wrestled with whether the legislature alone could decide if "a general law can be made applicable." Ind. Const. art. 4, § 23. But we ultimately determined in 1933 that complete legislative deference did not square with the framers' intentions for enacting Article 4, Section 23. We explained that "it was intended by the framers of the Constitution that the decision of this court should determine the law and the limits of legislative power."[6] *Heckler v. Conter*, 206 Ind. 376, 381, 187 N.E. 878, 879 (1933). So, it is for the Court to decide that a law cannot stand "[i]f the law is local or special, and it is clear that a general law can be made applicable." *Id.* at 381, 187 N.E. at 879.

Next came a string of cases involving Article 4, Section 23 challenges to laws with population restrictions. In most cases, the laws were upheld as "general laws." *See, e.g., Groves v. Bd. of Comm'rs*, 209 Ind. 371, 375–76, 380, 199 N.E. 137, 139–41 (1936) (upholding law that applied to counties with a population between 250,000 and 400,000 having three or more cities each with a population of 50,000 or more); *Evansville-Vanderburgh Levee Auth. Dist. v. Kamp*, 240 Ind. 659, 661–66, 168 N.E.2d 208, 209–11 (1960) (upholding law that applied to counties with a population between 160,000 and 180,000); *Graves v. City of Muncie*, 255 Ind. 360, 362–64, 264 N.E.2d 607, 609–11 (1970) (upholding law that applied to any city in a county with a population between 110,000 and 120,000); *N. Twp. Advisory Bd. v. Mamala*, 490 N.E.2d 725, 726 (Ind. 1986) (upholding law that applied to townships with a population between 180,000 and 204,000).

Yet, in others, we found Article 4, Section 23 violations, after determining that the population classifications weren't permissible. *See Perry Civil Twp. v. Indianapolis Power & Light Co.*, 222 Ind. 84, 91–92, 51 N.E.2d 371, 374 (1943) (striking down law under Article 4, Section 23

---

[6] One legislative power that Article 4, Section 23 was enacted to limit is logrolling—a practice "in which it [becomes] customary for members of the legislature to vote for the local bills of others in return for comparable cooperation." *Kimsey*, 781 N.E.2d at 686 (alteration in original) (quoting Osborne M. Reynolds, Jr., *Local Government Law* 85–86 (1982)).

because the population did not "bear[] a rational relationship to the subject dealt with"); *State Election Bd. v. Behnke*, 261 Ind. 540, 543, 307 N.E.2d 56, 58 (1974) (striking down law under Article 4, Section 23 because it was written in a way that no other county could ever qualify).

From these cases, two guiding principles developed. First, although population alone was not a proper basis for legislative classification, the law would be upheld if the population classification had a "rational relationship" to the law's subject matter. *See Perry Civil Twp.*, 222 Ind. at 91, 51 N.E.2d at 374. Second, a law was classified as "general" if it was possible for other political subdivisions to move into the population category in the future; it did not matter if, at the time of passage, a law applied to only one locale. *See Graves*, 255 Ind. at 363–64, 264 N.E.2d at 610–11.

These principles, though, were later replaced by a more fine-tuned approach. It started in 1994 with *Moseley*, which observed that even if a law is general in form, it may be unconstitutional special legislation as applied if the unique characteristics of a political subdivision do not justify the law's different treatment. *Ind. Gaming Comm'n v. Moseley*, 643 N.E.2d 296, 301 (Ind. 1994).

In that case, this Court examined a statute that, through population categories, permitted only Lake County to vote on riverboat gambling by city (versus by county). *Id.* at 298. In evaluating the Article 4, Section 23 challenge, the Court began with the well-established and oft-stated principle that it presumes the constitutionality of the statute. *Id.* at 300. We then focused on more than the law's population classifications alone, explaining that we "must examine whether the law, even if general in form, is special as applied." *Id.* at 301.

In upholding the law, the Court reasoned that the statute was not subject to a uniform law of general applicability because "not every county is home to a suitable body of water." *Id.* And even though the law treated Lake County differently than other waterfront counties, we found the differential treatment fit into the purpose of the law. *Id.* A unique characteristic of Lake County—namely, that its whole waterfront was covered by substantial cities—justified the distinction. *Id.*

Two years later, this Court built on *Moseley*'s analytical framework, focusing on when special legislation is "constitutionally permissible." In *Hoovler*, we analyzed a special law that helped Tippecanoe County address the financial burden of cleanup costs associated with a "Superfund" landfill site. *State v. Hoovler*, 668 N.E.2d 1229, 1234 (Ind. 1996). In doing so, we examined "circumstances surrounding [the Act], including language in the Act itself," and determined that the statute was special legislation because the legislature intended that it apply to only Tippecanoe County. *Id.*

We then concluded that the law was constitutional because Tippecanoe County's "Superfund" landfill site possessed a characteristic that justified the special legislation. *Id.* at 1235; *see also Kimsey*, 781 N.E.2d at 694 n.8. Specifically, the EPA gave a special designation to Tippecanoe's particular "Superfund" site, exposing that county to unique potential financial liability. *Hoovler*, 668 N.E.2d at 1235. And, so, a general law could not apply uniformly in all counties. *Id.* Ultimately, by building upon *Moseley*'s analytical framework, *Hoovler* provided valuable guidance for analyzing the constitutionality of a special law.

With *Moseley* and *Hoovler* as our guides, we next explained in *Williams* that analyzing a challenge under Article 4, Section 23 requires two steps. *Williams v. State*, 724 N.E.2d 1070, 1085 (Ind. 2000). First, we determine whether the law is general or special. *Id.* Second, if the law is general, we decide whether it is applied generally throughout the state; but if the law is special, we decide whether the law is nevertheless constitutionally permissible. *Id.*

In that case, we reviewed a statute that provided for the appointment of magistrates only in Lake County courts. *Id.* After determining that the magistrate statute was special—given that it provided for the appointment of magistrates solely in Lake County—this Court upheld the law as constitutionally permissible. *Id.* at 1085–86. We reasoned that the unique characteristics of Lake County, a large county with a large case docket, made the special treatment appropriate. *Id.* at 1086.

The approaches taken in *Moseley*, *Hoovler*, and *Williams*—looking to the actual effect of and underlying reasons for the statute—laid the

groundwork for this Court's *Kimsey* decision. In that case, the legislature passed a law permitting counties with a population between 200,000 and 300,000 to defeat a proposed annexation if a simple majority of landowners opposed it. *Kimsey*, 781 N.E.2d at 684. The challenged law applied exclusively to St. Joseph county; for all other counties, the statute required the opposition of 65% of landowners to defeat annexation. *Id.* at 684–85.

This Court noted that "if there are characteristics of the locality that distinguish it for purposes of the legislation, and the legislation identifies the locality, it is special legislation." *Id.* at 692. We then pointed to the circumstances surrounding the law's enactment, and concluded that it was indeed special legislation because the population classification "served no purpose other than to identify St. Joseph County." *Id.* at 693.

But unlike the laws in *Moseley*, *Hoovler*, and *Williams*, the special legislation in *Kimsey* was unconstitutional because a general law could be made applicable to deal with the targeted conditions. *Id.* at 694. We explained, "if the conditions the law addresses are found in at least a variety of places throughout the state, a general law can be made applicable and is required by" Article 4, Section 23. *Id.* at 692–93. Even though several rationales were advanced in support of the statute's constitutionality, none of those justifications were "inherent in the population range" and none "turn[ed] on facts unique to St. Joseph County." *Id.* at 694.

In this way, *Kimsey* helped illuminate when special legislation is unconstitutional. But perhaps *Kimsey*'s most significant contribution to Article 4, Section 23 jurisprudence was its discussion of who bears the burden of proof when special-legislation challenges are lodged. Specifically, *Kimsey* acknowledged the necessity of the "proponents of . . . special legislation" to have "a factual basis upon which to rest their assertion that a general statute could not apply," pointing out that the Court was "directed to nothing in the record and no relevant facts susceptible of judicial notice that are unique to St. Joseph County." *Id*. In other words, *Kimsey* highlighted that the proponent of the special law

bears the burden of establishing that an affected class's unique characteristics justify the particular differential treatment.

*Kimsey*'s discussion of the proper analysis for Article 4, Section 23 claims was quite comprehensive, providing well-defined guidance for this Court's more recent special-legislation cases. In two of those cases—*Lake Superior Court* and *Buncich*—following the analytical framework laid out in *Kimsey* and its predecessors led the Court to reject Article 4, Section 23 challenges. In a third case—*Alpha Psi*—following the same framework led the Court to strike down a special law as unconstitutional.

In *Lake Superior Court*, we examined two countywide reassessment statutes that applied only to Lake County. *State ex rel. Att'y Gen. v. Lake Superior Court*, 820 N.E.2d 1240, 1250–51 (Ind. 2005). We determined that the law did not run afoul of Article 4, Section 23 because "no comparable set of circumstances in any other county produc[ed] such widespread tax inequities and unusual issues of valuation." *Id.* at 1250. We reached this conclusion because a proponent of the law "point[ed] to the long and tortured history of property taxation in Lake County," *id.* at 1249, and we had "administrative findings, judicial findings, and legislative action all pointing to a unique circumstance created by uneven assessment practices" in that particular county, *id.* at 1250.

Similarly, in *Buncich*, we upheld a special law—again applying only to Lake County—aimed at reducing costs of administering elections by consolidating smaller precincts. *State v. Buncich*, 51 N.E.3d 136, 141 (Ind. 2016). *Buncich* began by reinforcing the general principle that a statute is "clothed with the presumption of constitutionality." *Id.* (quoting *Boehm v. Town of St. John*, 675 N.E.2d 318, 321 (Ind. 1996)).

Then, in addressing the special law at issue, the Court noted that the competing arguments involved "a question of degree." *Id.* at 143. Specifically, while the State pointed to the high number of small precincts in Lake County, the opponent of the legislation countered that nearly all counties have small precincts. *Id.* at 142–43. Thus, since "Lake County is not unique merely because it has small precincts," *Buncich* posed the question, "[A]t what point does the sheer number of small precincts in

Lake County become a defining characteristic such that it justifies special legislation?" *Id.* at 143 (emphasis omitted).

This Court concluded that the opponent of the special law failed to "rebut[] the presumption that the legislature determined Lake County to be past that point," noting that Lake County had not only the "largest number of small precincts in the state" but also "more than twice as many as all other counties." *Id.* Recognizing that statistics "may be pliable," *id.*, the Court threw "the benefit of the doubt in favor of the constitutionality of the law," *id.* (quoting *Moseley*, 643 N.E.2d at 300). Accordingly, we determined that the special legislation was constitutionally permissible. *Id.*

Conversely, this Court struck down special legislation in *Alpha Psi*, determining that the differential treatment wasn't warranted because there was "nothing unique" about the specified class. *Alpha Psi Chapter of Pi Kappa Phi Fraternity, Inc. v. Auditor of Monroe Cty.*, 849 N.E.2d 1131, 1138 (Ind. 2006). In that case, we addressed a statute that essentially gave filing extensions to three Indiana University fraternities for their property-tax-exemption applications. *Id.* at 1133. In finding an Article 4, Section 23 violation, we stressed that the law's proponent gave "no meaningful explanation as to why the problems" the affected class faced were "any different than those faced by landowning fraternities and sororities throughout the state." *Id.* at 1138. Rather, we determined that the offered justifications merely identified unique characteristics of fraternities or sororities "as a whole." *Id.* Thus, we classified the statute in *Alpha Psi* as "precisely the sort of 'special law' that" our drafters in 1850 and 1851 sought to eliminate. *Id.* at 1139.

So, what can be distilled from this review of Article 4, Section 23 case law? In sum—that the constitutionality of special legislation hinges on the uniqueness of the identified class and the relationship between that uniqueness and the law. More specifically, a special law complies with Article 4, Section 23 when an affected class's unique characteristics justify the differential treatment the law provides to that class. *See Buncich*, 51 N.E.3d at 143; *Lake Superior Court*, 820 N.E.2d at 1250; *Williams*, 724 N.E.2d at 1086; *Hoovler*, 668 N.E.2d at 1235; *Moseley*, 643 N.E.2d at 301. But, a special law violates Article 4, Section 23 when there are no unique

circumstances of an affected class that warrant the special treatment—meaning that a general law could be made applicable. *See Alpha Psi*, 849 N.E.2d at 1138–39; *Kimsey*, 781 N.E.2d at 694.

With this test, though, we keep in mind two considerations.

First, because a special-legislation challenge is a type of constitutional challenge, there is an overarching presumption that the statute is constitutional. *See, e.g., Buncich*, 51 N.E.3d at 141. So in close cases, the special law will be upheld. *See id.* at 143.

Second, once a special-legislation claim is lodged and the court determines that the law is indeed special, the burden is on the proponent to show that a general law can't be made applicable. *See id.* This requires the legislation's proponent to clear a low bar by establishing a link between the class's unique characteristics and the legislative fix. *See id.* If the proponent overcomes its initial hurdle to show a link between the unique characteristics and the special treatment, but the case poses a question of degree—i.e., the characteristics used to justify the special law are common to the specified class and to those outside of the class—then the opponent of the legislation must show why the specified class's characteristics are not defining enough to justify the special legislation. *See, e.g., id.*; *Moseley*, 643 N.E.2d at 301. By carrying this burden, the opponent demonstrates that the law's proponent has failed to justify the special treatment.

With that multi-layered analytical framework, we turn to the Fee Exemption's constitutionality.

## III.   Applying the current analytical framework to the Fee Exemption

Since the parties agree that the Fee Exemption is special legislation, we face the question, "Is the special legislation constitutionally permissible?" To answer that question, we apply the framework outlined above.

As the proponents of the Fee Exemption, Herman & Kittle must establish why the law couldn't operate statewide. Again, this burden is

overcome—at least initially—by demonstrating a link between the class's unique characteristics and the legislative fix. Herman & Kittle argues that the special law is justified because of three unique characteristics in Bloomington and West Lafayette: (1) a higher-than-average share of renters; (2) a large percentage of young, unsophisticated renters; and (3) a history of regulating landlords in the rental markets through inspection and registration programs. We address each of these proffered justifications in turn.

According to 2010 census data, Bloomington and West Lafayette do have the highest percentages of renter-occupied housing units in Indiana, at 67% and 67.6%, respectively. Herman & Kittle links these percentages to the Fee Exemption's special treatment by arguing that the rental percentages in Bloomington and West Lafayette "giv[e] landlords unequaled control over the supply of housing." Though this may be enough to overcome the proponent's initial burden, the rental-percentage characteristic raises a question of degree, and Hammond has shown that those percentages are not defining enough to justify the differential treatment.

The same data that identifies Bloomington's and West Lafayette's percentages of renter-occupied units shows that other Indiana municipalities have similarly high percentages of renter-occupied housing units: East Chicago at 58.5%, Speedway at 51.5%, Elkhart at 49.2%, Lafayette at 48.7%, Muncie at 48.6%, Gary at 47.3%, Valparaiso at 44.6%, Terre Haute at 44.5%, Indianapolis at 44.2%, and Evansville at 44%. Thus, we agree with Hammond that the moderately higher percentages found in Bloomington and West Lafayette are not defining characteristics that can justify the preferential treatment provided to just those two cities. *Cf. Buncich*, 51 N.E.3d at 143.

Herman & Kittle's second explanation to support the Fee Exemption is that Bloomington and West Lafayette have high percentages of students who are "often unsophisticated first-time renters" because the cities are home to Indiana University and Purdue University, respectively. Yet, Herman & Kittle gives no reason why these types of renters are grounds to permit rental-registration fees over $5.

Nor are Bloomington and West Lafayette the only two cities in Indiana containing a large public university with many students who are "often unsophisticated first-time renters." For example, Muncie has Ball State University; Indianapolis has Indiana University–Purdue University; and Terre Haute has Indiana State University. So on its second asserted justification, Herman & Kittle has failed to establish a unique characteristic that warrants special treatment. *See Alpha Psi*, 849 N.E.2d at 1138.

Herman & Kittle finally argues that Bloomington and West Lafayette have uniquely long histories of regulating landlords in the rental-housing market. True, the evidence before us shows that Bloomington created its program either in 1961 or in the early 1970s, and West Lafayette's program began in 1976. But Herman & Kittle has failed to establish that these are uniquely long-running programs, particularly compared to Hammond's, which was created in 1961, and the City of Goshen's, which has spanned more than 25 years. Since Bloomington and West Lafayette do not have uniquely long-running programs, Herman & Kittle cannot link them to the Fee Exemption's special treatment. Thus, the evidence before us shows that the Fee Exemption is amenable to being applied generally throughout the State.

Ultimately, Herman & Kittle's proffered justifications do not support the differential treatment the Fee Exemption gives to Bloomington and West Lafayette. In other words, this case is starkly different from prior cases in which this Court found a relationship between an affected class's unique characteristics and the special treatment granted to that class.

To be sure, this case is unlike *Hoovler*, where the unique financial liability Tippecanoe County faced was directly related to the tax-increase relief it received through special legislation. *Hoovler*, 668 N.E.2d at 1235. It's also unlike *Williams*, where the unique needs of Lake County justified the special law providing for the appointment of magistrates in that county alone. *Williams*, 724 N.E.2d at 1085–86. The circumstances here also differ from those in *Lake Superior Court*, where the unique scale, complexity, and tortured history of property taxation in Lake County warranted the special legislation aimed at fixing the issue through

reassessment. *Lake Superior Court*, 820 N.E.2d at 1250–51. And, finally, this case is dissimilar to *Buncich*, where a uniquely large number of small precincts in Lake County directly related to the special legislation reducing the number of small precincts. *Buncich*, 51 N.E.3d at 143.

Unlike the special legislation described above, the Fee Exemption cannot survive an Article 4, Section 23 challenge. The justifications set forth by Herman & Kittle demonstrate nothing more than a "generalized uniqueness" in Bloomington and West Lafayette. *Id.* at 142 n.7. In other words, while there are characteristics of Bloomington and West Lafayette that may be uncommon or rare across the state, that is not enough; rather, "there must be unique characteristics that **justify** the particular piece of legislation." *Id.* (emphasis added). There is no evidence, for example, that either Bloomington or West Lafayette is facing a fiscal issue that would justify charging higher amounts for rental-registration fees than every other municipality in the state. At the end of the day, the evidence does not indicate that Bloomington and West Lafayette—and those two cities alone—need the Fee Exemption's special treatment. *Cf. id.* at 143; *Lake Superior Court*, 820 N.E.2d at 1249–50; *Hoovler*, 668 N.E.2d at 1235; *Moseley*, 643 N.E.2d at 301.

The Fee Exemption is precisely the type of law our framers sought to eliminate during the 1850–1851 Constitutional Convention. While the bar to establish the constitutionality of special legislation is by no means a high one, the proponent still must justify the special treatment afforded to the specified class. Here, Herman & Kittle has not done so.

For two of the proffered "unique characteristics," Herman & Kittle failed to establish a link between those characteristics and the Fee Exemption's preferential treatment. Specifically, Herman & Kittle didn't explain why populations of young, unsophisticated renters or long-running rental-fee programs justify allowing Bloomington and West Lafayette to charge rental fees over $5. For the third alleged "unique characteristic"—that the two cities have high percentages of renter-occupied properties—Herman & Kittle managed to link the characteristic to the legislative remedy. But Hammond then pointed to similarly high rental-occupancy percentages throughout the state, showing why that

characteristic was not defining enough to justify preferential treatment to only Bloomington and West Lafayette. Thus, a general law can be made applicable, which means the Fee Exemption is unconstitutional special legislation.

Because the Fee Exemption is constitutionally defective under Article 4, Section 23, that provision must be stricken. *See Kimsey*, 781 N.E.2d at 696. But what does that mean for the remainder of Indiana Code section 36-1-20-5—particularly the Fee Restriction that imposes the $5 limit on rental-registration fees? To answer that question, we explore the principles of severability.

## IV.    Severability of the Fee Exemption

"A statute bad in part is not necessarily void in its entirety." *Paul Stieler*, 2 N.E.3d at 1279 (quoting *Dorchy v. Kansas*, 264 U.S. 286, 289 (1924)). Rather, we must determine whether the infirm provision of a statute is severable, leaving the remainder intact. *Id.*

To make this determination, we ask whether the statute can stand on its own without the invalid provision, and whether the legislature intended the remainder of the statute to stand if the invalid provision is severed. *Id.* If we answer either question in the negative, the offending provision is not severable, and the whole statute must be stricken. *See id.*

Herman & Kittle and Hammond understandably take diverging positions on this issue. While Herman & Kittle advocates for severability of the Fee Exemption, Hammond does not. Accepting Herman & Kittle's position would mean that the Fee Restriction remains valid; that it would apply to every political subdivision across the state; and that, consequently, no political subdivision could charge more than a $5 per-rental-registration fee. Accepting Hammond's position, however, would mean that Indiana Code section 36-1-20-5 is void in its entirety, eliminating any statutory restriction on how much municipalities could charge for registration fees.

Siding with Hammond, the Court of Appeals struck down the whole statutory section, finding the Fee Exemption nonseverable. *City of*

*Hammond*, 95 N.E.3d at 144. In doing so, the panel relied on certain legislative history to conclude that the General Assembly would not have approved the Fee Restriction without an exemption for Bloomington and West Lafayette. *See id.* at 143–44.

Notably, in its analysis, the Court of Appeals pointed out that Chapter 36-1-20 does not contain a severability clause and relied on this Court's decision in *Benton Community* in stating that "[t]he inclusion of a severability clause creates a presumption that the remainder of the Act may continue in effect" but that "[t]he absence of a severability clause creates the opposite presumption: the Legislature intends the Act to be effective as an entirety or not at all." *City of Hammond*, 95 N.E.3d at 143 (quoting *Ind. Educ. Emp't Relations Bd. v. Benton Cmty. Sch. Corp.*, 266 Ind. 491, 510, 365 N.E.2d 752, 762 (1977)).

Herman & Kittle argues that the Court of Appeals failed to acknowledge and apply the correct presumption—one created by Indiana Code section 1-1-1-8. This statute was significantly amended after *Benton Community* to include a new subsection (b), which provides in part,

> (b) **Except in the case of a statute containing a nonseverability provision, each part and application of every statute is severable**. If any provision or application of a statute is held invalid, the invalidity does not affect the remainder of the statute unless:
>> (1) the remainder is so essentially and inseparably connected with, and so dependent upon, the invalid provision or application that it cannot be presumed that the remainder would have been enacted without the invalid provision or application; or
>> (2) the remainder is incomplete and incapable of being executed in accordance with the legislative intent without the invalid provision or application.

*See* 1987 Ind. Acts 1, P.L. 1, § 1 (codified at I.C. § 1-1-1-8 (2018)) (emphasis added). Herman & Kittle asserts that because Indiana Code section 36-20-1-5 lacks a nonseverability clause, the presumption is that the Fee

Exemption is severable from the remainder of the statute. The landlord further claims that the statute's history shows that the legislature's primary focus was on addressing the escalating rental-registration fees throughout the State and their negative effects—not on exempting Bloomington and West Lafayette from the caps on fees.

Succinctly put, the issue before us is whether the legislature intended the Fee Restriction to live and die with the Fee Exemption. Because the General Assembly did not include a nonseverability clause, under Indiana Code section 1-1-1-8(b), the presumption is that the invalid provision— here, the Fee Exemption—is severable from the remainder of the statute. Given the absence of the nonseverability clause, the burden is on Hammond to show that the whole statute must be stricken.[7] This is done by demonstrating that the invalid provision is "inseparably connected with" and "dependent upon" the remainder of the statute, or by demonstrating that the remainder cannot be applied in accordance with legislative intent. I.C. § 1-1-1-8(b).

In support of Hammond's argument that the legislature would not have passed the Fee Restriction without the Fee Exemption, the city points to three failed legislative attempts to impose fee restrictions statewide: (1) HB 1543, which, as introduced, barred all political subdivisions from requiring rental-unit registration; (2) HB 1313, which, as introduced, barred all political subdivisions from imposing rental-unit registration fees; and (3) HB 1403, which, as introduced, barred all political subdivisions from charging a rental-registration fee of more than $5.

---

[7] In *Benton Community*, this Court recognized that, with a presumption of nonseverability in the absence of a severability clause, "the burden is upon the supporter of the legislation to show the separability of the provisions involved." 266 Ind. at 510–11, 365 N.E.2d at 762 (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 312 (1935)). But when the legislature added subsection (b) to Indiana Code section 1-1-1-8 after *Benton Community*, this subsection shifted the presumption by stating that "[e]xcept in the case of a statute containing a nonseverability provision, each part and application of every statute is severable." With the presumption shifted, the burden to overcome that presumption likewise shifted—now requiring, in the absence of a nonseverability clause, the opponent of the legislation to show that the entire statute must be stricken down. *Cf. Carter*, 298 U.S. at 312.

Hammond asserts that none of these bills exempted Bloomington and West Lafayette from fee restrictions and that HB 1403 passed only after the Fee Exemption was added. Thus, according to Hammond, the legislature would not want a provision limiting rental-registration fees to just $5 (the Fee Restriction) unless Bloomington and West Lafayette were spared from that restriction (Fee Exemption).

Herman & Kittle responds that the Fee Restriction's vitality doesn't depend on the validity of the Fee Exemption. The landlord points out that the primary legislative concern in enacting the Fee Restriction was rising fees that were negatively impacting the affordability of rental housing and stifling rental development. Herman & Kittle maintains that, given this primary concern, we must presume the legislature intended for the Fee Restriction to apply to all political subdivisions—including Bloomington and West Lafayette—rather than having no rental-fee restrictions statewide. We agree.

Although both parties present defensible arguments, Indiana Code section 1-1-1-8(b)'s presumption operates in favor of severability—and Hammond has failed to defeat that presumption. Hammond has not demonstrated that the legislature intended to revert back to a time when political subdivisions could charge any rental-registration-fee amount of their choosing. Rather, the legislature, over many years, strove to limit the burden that increasing fees were placing on rental communities. Thus, to invalidate the Fee Restriction would go against legislative intent—not support it. Accordingly, the Fee Exemption is severable from the remainder of Indiana Code section 36-1-20-5.

## Conclusion

Under Article 4, Section 23 of the Indiana Constitution, special legislation is constitutionally infirm if "a general law can be made applicable." And a general law can be made applicable if the affected class possesses no unique characteristics that justify the special treatment afforded by the special law.

Here, as the proponents of the Fee Exemption, the State and Herman & Kittle bore the burden to demonstrate why Bloomington and West Lafayette should be able to charge any amount for rental-registration fees, when all other political subdivisions across the state are capped at $5. Because they failed to make that showing, the Fee Exemption is unconstitutional special legislation that must be stricken.

But the Fee Exemption is severable from the remainder of Indiana Code section 36-1-20-5, given Hammond's failure to rebut an applicable statutory presumption of severability. Thus, the Fee Restriction now operates statewide, and all municipalities are restricted from charging a rental-registration fee that exceeds $5.

Accordingly, the judgment of the trial court in favor of Herman & Kittle is reversed to the extent the trial court found the Fee Exemption constitutional. The case is remanded to the trial court with instructions to enter a judgment in favor of Herman & Kittle on the issue of severability and for further proceedings consistent with this opinion.

David, Massa, and Goff, JJ., concur.

Slaughter, J., not participating.

ATTORNEYS FOR APPELLANT
Bryan H. Babb
Bradley M. Dick
Bose McKinney & Evans LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Steven C. Shockley
Russell C. Menyhart
Taft Stettinius & Hollister LLP
Indianapolis, Indiana

ATTORNEYS FOR INTERVENOR
Curtis T. Hill, Jr.
Attorney General of Indiana

Thomas M. Fisher
Solicitor General

Frances H. Barrow
Julia C. Payne
Deputy Attorneys General
Indianapolis, Indiana